[Cite as *Magnum Steel & Trading, L.L.C. v. Mink*, 2013-Ohio-2431.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| MAGNUM STEEL & TRADING, LLC, et al. | C.A. Nos. 26127      26231 |
|     Appellee/Cross-Appellant | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GERALD MINK, et al. | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
|     Appellant/Cross-Appellee | CASE No.    CV 2009-10-7488 |

DECISION AND JOURNAL ENTRY

Dated: June 12, 2013

WHITMORE, Judge.

{¶1} Appellant/Cross-Appellee, Gerald Mink, appeals from the judgment of the Summit County Court of Common Pleas in favor of Appellee/Cross-Appellant, Magnum Steel & Trading, LLC ("Magnum"). Additionally, Magnum appeals from the judgment on several grounds. This Court affirms in part and reverses in part.

I

{¶2} For several years, Gerald Mink ("G. Mink"), Jarrod Mink ("J. Mink"), and Jeffrey Shupe worked at Magnum as scrap steel traders. G. Mink, in particular, had a lengthy relationship with the company and its owner, Paolo Giorgi. In their role as traders, the three men purchased scrap steel from various companies and sold that same scrap steel to other companies. Although the steel industry fluctuated to some extent over the course of the years, a serious market decline occurred in the fall of 2008 and resulted in a loss of profits for the three traders. The decline coincided with growing dissatisfaction among the three traders and eventually led

them to the decision to form their own company; a company later named FerroTrade Corporation ("FerroTrade"). When Giorgi discovered that G. Mink, J. Mink, and Shupe had formed their own company and, from what Giorgi understood, had taken confidential information and customer resources from Magnum to do so, he terminated all three men. The termination occurred on October 5, 2009.

{¶3} After the termination, Magnum brought an eleven-count complaint against G. Mink, J. Mink, Shupe, and FerroTrade for trade secret misappropriation, breach of the duty of loyalty, conversion, tortious interference with contractual relations, tortious interference with business relations, raiding, commercial disparagement and defamation, inevitable disclosure, promissory estoppel, unjust enrichment, and civil conspiracy. The four defendants answered and brought five counterclaims/cross-claims of their own against Magnum and Giorgi. All of the counterclaims/cross-claims were resolved by either dismissal or summary judgment and are not at issue on appeal.

{¶4} Upon the defendants' motion, the trial court entered judgment on the pleadings in favor of the defendants on Magnum's claims for raiding and inevitable disclosure. The defendants also moved for summary judgment on seven of Magnum's other claims, but the trial court denied their motion. Magnum's remaining nine claims were then presented to a jury. At the conclusion of trial, the court granted a directed verdict in the defendants' favor on Magnum's claims for conversion and commercial disparagement and defamation. The jury received the remaining seven counts. Of importance to this appeal, the jury found: (1) G. Mink liable for $219,355.07 on the tortious interference with contractual relations count; (2) G. Mink liable for $0 on the tortious interference with business relations count; (3) G. Mink liable for $115,926.51 on the promissory estoppel count; and (4) G. Mink liable for $0 on the unjust enrichment count.

The jury also awarded Magnum $110,000 in punitive damages with regard to G. Mink on the count for tortious interference with contractual relations and found that Magnum was entitled to an award of attorney fees.

{¶5} Subsequently, both parties filed motions for judgment notwithstanding the verdict ("JNOV"). Magnum also sought prejudgment interest on its promissory estoppel claim and attorney fees. The trial court denied the JNOV motions and Magnum's request for prejudgment interest, but ultimately awarded Magnum $66,036.50 in attorney fees. On February 14, 2012, the trial court entered judgment in accordance with the jury's verdicts.

{¶6} After one attempted appeal resulted in a dismissal for lack of a final, appealable order, two more appeals were filed. The first appeal (Appeal No. 26127) was filed by G. Mink and Jeffrey Shupe. The second appeal (Appeal No. 26231) was only filed by G. Mink. Magnum filed cross-appeals under both case numbers. This Court eventually consolidated the two appeals for decision and named G. Mink and Shupe as the appellants/cross-appellees and Magnum as the appellee/cross-appellant. On January 25, 2013, the firm representing G. Mink and Shupe, Roderick Linton Belfance, LLP, filed a motion to withdraw as counsel for Shupe. The motion to withdraw indicates that, before Appeal No. 26231 was filed, Shupe terminated the firm's services and notified the firm that he did not want it to pursue an appeal on his behalf. Consequently, the firm only filed Appeal No. 26231 on G. Mink's behalf and filed the briefs in Appeal Nos. 26127 and 26231 on behalf of G. Mink alone. The certificate of service on the firm's motion to withdraw indicates that Shupe was served with a copy of the motion.

{¶7} Shupe has not filed any briefs on appeal. He also never indicated to this Court that he wished to pursue his appellate rights in either Appeal No. 26127 or Appeal No. 26231. Consequently, with regard to Appeal No. 26127, this Court dismisses the appeal solely as it

relates to Shupe. *See* App.R. 18(C). Appeal No. 26127 remains as an appeal taken by G. Mink alone. With regard to Appeal No. 26231, Shupe remains designated as a cross-appellee; albeit one who has not filed a responsive brief. *See id.* Roderick Linton Belfance, LLP's motion to withdraw as counsel for Shupe is granted.

{¶8} G. Mink's appeal and Magnum's cross-appeal are now before this Court for review. For ease of analysis, we consolidate several of the assignments of error.

II

G. Mink's Assignment of Error Number One

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTS.

G. Mink's Assignment of Error Number Two

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANTS' MOTION FOR DIRECTED VERDICT AND THE MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTS.

G. Mink's Assignment of Error Number Three

THE JURY VERDICT ON THE INTENTIONAL INTERFERENCE WITH CONTRACT CLAIM IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9} In his first three assignments of error, G. Mink argues that Magnum ought not to have prevailed on its claim for tortious interference with contractual relations. He argues that the trial court erred by denying his motion for summary judgment on the claim as well as his motions for directed verdict and JNOV. Further, he argues that the jury's verdict on the claim is against the manifest weight of the evidence.

{¶10} "In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the

wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415 (1995), paragraph two of the syllabus. "Tortious interference with a business relationship is similar but occurs when the result of the interference is not breach of contract, but that a third party does not enter into or continue a business relationship with the plaintiff." *Oliver v. Wagner*, 9th Dist. No. 2832-M, 1999 WL 1215131, *3 (Dec. 8, 1999). If no contract existed between the plaintiff and a third party at the time when the defendant allegedly interfered, the plaintiff's claim for intentional interference with a contract must fail as a matter of law. *Egypt, Inc. v. Akron Bd. of Educ.*, 9th Dist. No. 14687, 1990 WL 209693, *2 (Dec. 19, 1990).

**Motion for Summary Judgment**

{¶11} G. Mink first argues that the trial court erred by denying his motion for summary judgment. "[A]n error by the trial court in denying a motion for summary judgment is rendered harmless if a later trial on the merits involving the same issues demonstrates that there were genuine issues of material fact and results in a judgment in favor of the party against whom the motion was made." *Amore v. Ohio Turnpike Comm.*, 194 Ohio App.3d 182, 2011-Ohio-1903, ¶ 32 (9th Dist.). Magnum's claim for tortious interference with contractual relations resulted in a jury verdict in Magnum's favor. Therefore, "[t]his Court, without determining whether the trial court committed any error in denying [G. Mink's] motion for summary judgment, need only determine whether genuine issues of fact were raised at trial." *First Merit Bank, N.A. v. Wilson*, 9th Dist. No. 23363, 2007-Ohio-3239, ¶ 24. As explained below, genuine issues of material fact existed for trial. Accordingly, any error by the trial court in denying G. Mink's motion for summary judgment was harmless. G. Mink's first assignment of error is overruled.

**Directed Verdict / Judgment Notwithstanding the Verdict**

{¶12} "An appellate court reviews a trial court's ruling on a motion for a directed verdict de novo, as it presents an appellate court with a question of law. A motion for a directed verdict assesses the sufficiency of the evidence, not the weight of the evidence or the credibility of the witnesses." (Internal citations omitted.) *Jarvis v. Stone*, 9th Dist. No. 23904, 2008-Ohio-3313, ¶ 7. *See also* Civ.R. 50(A). After a court enters judgment on a jury's verdict, a party may file a JNOV to have the judgment set aside on grounds other than the weight of the evidence. *See* Civ.R. 50(B). As with an appeal from a court's ruling on a directed verdict, this Court reviews a trial court's grant or denial of a JNOV de novo. *Williams v. Spitzer Auto World Amherst, Inc.*, 9th Dist. No. 07CA009098, 2008-Ohio-1467, ¶ 9. "JNOV is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the nonmoving party reasonable minds could come to but one conclusion, that being in favor of the moving party." *Id.* at ¶ 9, citing Civ.R. 50(B). If reasonable minds could reach different conclusions, the motion must be denied. *Garcea v. Woodhull*, 9th Dist. No. 01CA0069, 2002-Ohio-2437, ¶ 10.

{¶13} Magnum sought damages against G. Mink on its claim for tortious interference with contractual relations based on G. Mink's actions towards ten specific Magnum customers. Those ten customers were: Beaver Valley Slag, Beckett Gas, Spirol International, Machine Tek Systems, Inc., Stock Equipment Company, Clinton Aluminum & Stainless Steel, National Machine, Cleveland Steel Container, U.S. Gypsum, and Ohio Star Forge ("OSF"). According to G. Mink, he was entitled to a directed verdict/JNOV because Magnum failed to set forth sufficient evidence that it had a contract with any of the foregoing customers at the time that G. Mink allegedly caused the customers to breach.

{¶14} Although Magnum did business with all ten of the foregoing customers when it terminated G. Mink, Giorgi admitted at trial that Magnum did not have a contract with Beaver Valley Slag, Machine Tek Systems, Inc., or Stock Equipment Company. As to Beckett Gas and Spirol International, Giorgi testified that he did not know if Magnum had a contract with those companies. Representatives from those companies later testified, however, that their companies did not have long-term contracts with Magnum. Wayne Walker from Beckett Gas and Brett Waller from Spirol International both testified that their companies only had month-to-month arrangements with Magnum.

{¶15} Giorgi did not testify as to the specific arrangements between Magnum and National Machine, Cleveland Steel Container, or Clinton Aluminum & Stainless Steel, but stated that both National Machine and Cleveland Steel Container left Magnum several months after G. Mink's termination to do business with G. Mink's company, FerroTrade. As to U.S. Gypsum and OSF, Giorgi specifically testified that Magnum had a written contract with both companies. U.S. Gypsum stayed with Magnum until the expiration of its contract and signed a contract with FerroTrade only after soliciting bids. OSF signed a contract with FerroTrade on October 6, 2009, the day after Magnum terminated G. Mink.

{¶16} Magnum terminated G. Mink on October 5, 2009. Magnum's owner, Paolo Giorgi, testified that he decided to terminate G. Mink after he discovered that G. Mink had been contacting Magnum's customers and that "documentation [had been] destroyed or taken away." Mike Coiner, a former Magnum employee who Giorgi rehired in mid-October, testified that when he returned to Magnum and looked through its customer files, he "could not find most of the material" for Magnum's customers, including its contracts. One particular contract Magnum could not find was its contract with Greer Steel; a contract G. Mink admitted that he had kept in

his desk. According to G. Mink, he removed information from his office at Magnum before he was terminated, but all of the information he took was personal in nature.

{¶17} Brian Ray, a vice president with PNC Bank (fka National City Bank), testified that he met with G. Mink in September 2009 regarding a line of credit for G. Mink's new company. At the meeting, G. Mink told Ray that he was ready to break from Magnum and gave Ray a list of companies that had already agreed to do business with him at his new company. One of the companies he listed was OSF. G. Mink also told Ray that "the only contracts that [were] currently in place with customers [were] contracts with [him] directly, not with [Magnum]."

{¶18} The only copy of a written contract between Magnum and OSF that Magnum was able to produce at trial was a five-year contract that had expired on March 31, 2009. Giorgi testified that in 2007, G. Mink happily approached him and told him that he had played golf with OSF's president, Jeffrey Downing, and they "just renewed the contract for another seven years." G. Mink specified that rather than signing an entirely new contract, the two agreed to simply write in a new date on the existing contract and initial the change.

{¶19} Downing testified at trial by way of deposition. Downing testified that he met with G. Mink before his termination from Magnum. At that meeting, G. Mink told Downing he was forming a new company and he wanted OSF to do business with his new company. Downing stated that he told G. Mink OSF was under contract with Magnum, but G. Mink insisted that the contract had expired in March. Downing testified that he committed OSF "[i]n principle" at the meeting. Downing then later signed a contract with FerroTrade on October 6, 2009. G. Mink testified that he typed up the contract at home the night before he and Downing signed it. At trial, Magnum introduced copies of its expired contract with OSF and the new

contract that G. Mink drafted. Both contracts contained virtually the same provisions and formatting. Additionally, the new contract contained two handwritten provisions. G. Mink testified that Downing wanted two changes to the contract he had prepared so, rather than type a new contract, the two simply wrote in the changes and initialed them.

{¶20} G. Mink argues that the trial court erred by denying his motions for directed verdict/JNOV because he never caused any customer with whom Magnum had a contract to breach that contract. According to G. Mink, Magnum failed to set forth any evidence that it had a contract with eight of the ten customers that formed the basis of its claim. As to the ninth customer, U.S. Gypsum, G. Mink argues that Magnum failed to prove that he procured a breach of its contract with Magnum because the evidence was such that U.S. Gypsum waited for its contract to expire before soliciting bids and ultimately signing a contract with FerroTrade. As to the tenth customer, OSF, he argues that Magnum set forth insufficient evidence that it had an existing contract with that company.

{¶21} Viewing all of the evidence in a light most favorable to Magnum, we cannot conclude that the trial court erred by denying G. Mink's motions for directed verdict/JNOV. Magnum introduced evidence that G. Mink kept Magnum's customer contracts in his desk during his employment and, after his termination, Magnum was unable to locate all the materials for its customers, including its customer contracts. It also introduced representations that G. Mink made when he sought a line of credit for his new company, including the representation that OSF had agreed to do business with him. Interestingly, G. Mink did not tell the bank that Magnum did not have any contracts with its customers. Instead, he told the bank that the customer contracts that were currently in place were contracts with him directly, not with Magnum.

{¶22} Even assuming that G. Mink is correct that Magnum failed to set forth sufficient evidence that it (1) had a contract and that (2) G. Mink caused a breach of that contract with regard to nine of the ten customers at issue, the same cannot be said about OSF. Giorgi testified that in 2007 G. Mink told him he had "just renewed the [OSF] contract for another seven years." He specified that he and OSF's president, Jeffrey Downing, had agreed to change the year on the existing original contract by writing in the change and initialing it. Magnum was never able to find its original contract with OSF; it only ever found a copy of it. Moreover, the new contract between OSF and FerroTrade that G. Mink created the night he was terminated contained virtually the same provisions and formatting as the copy of Magnum's expired contract with OSF (which, with the exception of an initialed portion extending the expiration date, would have been identical to the original contract Magnum could not find). The new contract also contained a few additional provisions that G. Mink and Downing had simply handwritten and initialed; the same mechanism G. Mink allegedly told Giorgi that he and Downing had agreed to use to update OSF's contract with Magnum.

{¶23} G. Mink argues on appeal that Giorgi's testimony did not suffice to prove the existence of a contract because, at most, it merely supported that OSF and Magnum had an "agreement to agree," which would be unenforceable under the statute of frauds. G. Mink, however, never made the foregoing arguments in his motions for directed verdict/JNOV. "When reviewing arguments on appeal, this Court cannot consider issues that are raised for the first time on appeal." *Carnegie Cos., Inc. v. Summit Properties, Inc.*, 9th Dist. No. 25622, 2012-Ohio-1324, ¶ 8, quoting *Harris v. Akron*, 9th Dist. No. 24499, 2009-Ohio-3865, ¶ 9. Because G. Mink did not raise his agreement to agree or statute of frauds arguments in the court below, this Court will not address them on appeal.

{¶24} Although Magnum could not produce a copy of a renewed written contract with OSF, that fact alone was not fatal to Magnum's claim. *See Akron Group Servs., Inc. v. Patron Plastics, Inc.*, 9th Dist. No. 22507, 2005-Ohio-5101, ¶ 24 (question of fact regarding existence of contract where written contract could not be produced, but testimony supported its existence). *See also Campbell Oil Co. v. Shepperson*, 7th Dist. No. 05 CA 817, 2006-Ohio-1763, ¶ 27 ("[I]t is possible to establish the existence and content of a lost or destroyed contract through secondary evidence."). Given all the evidence in the record, this Court cannot say that "reasonable minds could come to but one conclusion," on Magnum's claim for tortious interference with contractual relations. *Williams*, 2008-Ohio-1467, at ¶ 9. As such, the trial court did not err by denying G. Mink's motions for directed verdict/JNOV. G. Mink's second assignment of error is overruled.

**Manifest Weight**

{¶25} In his third assignment of error, G. Mink challenges the weight of the evidence as to both the jury's verdict and the jury's damage award. As to the verdict, G. Mink argues that the jury lost its way because the evidence at trial supported the conclusion that Magnum and OSF did not have a contract that extended past March 31, 2009. As to the damage award, G. Mink argues that Magnum failed to produce any competent evidence from which the jury could have reasonably calculated the amount of damages to award Magnum for the purported loss of OSF as a customer.

{¶26} In a challenge to the weight of the evidence,

[t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Alterations sic.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Manifest weight challenges the burden of persuasion." *Stocker v. Stocker*, 9th Dist. No. 12CA0021, 2012-Ohio-5821, ¶ 26. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

**{¶27}** Both G. Mink and Downing testified at trial that Magnum and OSF did not have a contract that extended past March 31, 2009. Giorgi testified, however, that G. Mink told him in 2007 that he had renewed Magnum's contract with OSF for another seven years. Accordingly, Giorgi testified it was his understanding that Magnum and OSF had a contract through 2014. As previously set forth, Magnum was unable to produce its original contract with OSF, but Magnum's theory at trial was that G. Mink took the original contract from Magnum before he was terminated. There was testimony that G. Mink kept Magnum's customer contracts in his desk and that, after his termination, Magnum could not find all of its customer information, including contracts.

**{¶28}** In further support of its trial theory, Magnum presented testimony about a non-compete agreement that Shupe signed as part of his employment agreement when Magnum hired him. Shupe admitted that he signed a non-compete agreement, but Magnum was unable to produce it at trial because it was not a part of Shupe's personnel file. Anna Hardy, Magnum's Controller, testified that G. Mink approached her in July or August of 2009 and asked her to turn over certain personnel files, including Shupe's, so that he could note some type of incident that had occurred. Hardy testified that G. Mink returned the files a few days later and said that he had not had the time to put notes in the files after all. G. Mink admitted at trial that he shredded Shupe's non-compete agreement without consulting Giorgi. According to G. Mink, however, he

shredded the agreement within seven to ten days of Shupe's signing it in August 2006, not much later in July or August 2009.

{¶29} Based on our review of the record, we cannot conclude that the jury lost its way by finding that Magnum had a contract with OSF and that G. Mink tortiously interfered with it. "[T]he trier of fact was in the best position to evaluate the credibility of witnesses, and this Court will not overturn the [jury's] verdict on a manifest weight of the evidence challenge simply because the [jury] chose to believe certain witnesses' testimony over the testimony of others." *State v. Watts*, 9th Dist. No. 12CA0005, 2012-Ohio-5822, ¶ 18. Here, the jury simply chose to believe Magnum's version of the events. G. Mink's argument that the jury's verdict is against the manifest weight of the evidence lacks merit.

{¶30} G. Mink also argues that the jury's damage award is against the manifest weight of the evidence because Magnum failed to "produce any competent evidence whatsoever" of Magnum's loss of profits with regard to OSF. (Emphasis omitted.) According to G. Mink, Magnum only presented a calculation of lost profits as to all ten customers that left it to do business with G. Mink's company. Thus, G. Mink argues, Magnum failed to prove its future lost profits with regard to OSF alone such that the jury could calculate its damages.

{¶31} To the extent G. Mink argues that Magnum failed to produce any competent evidence in support of a damage award, that argument is not an appropriate manifest weight argument. Manifest weight tests the burden of persuasion, not the burden of production. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 17-19. Both Magnum and G. Mink presented expert testimony on Magnum's damages. Magnum's expert opined that Magnum suffered damages as a result of the departure of G. Mink, J. Mink, and Shupe and explained to the jury how he calculated Magnum's damages. He provided the jury with a total monthly gross profits

loss for Magnum as well as the individual components for each company comprising that total. Meanwhile, G. Mink's expert opined that Magnum's expert's report was deficient for a variety of reasons and that Magnum's damages, if any, could only be calculated with respect to OSF (the only customer of the ten with whom Magnum allegedly had a contract). As to OSF, G. Mink's expert opined that Magnum did not suffer any damages.

**{¶32}** "In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655 (1994). Although Magnum's expert projected that Magnum would incur a $1,027,665 loss over a ten year period as a result of G. Mink, J. Mink, and Shupe's actions, the jury only awarded Magnum $219,355.07 on its claim for tortious interference with contractual relations. G. Mink has not explained why that award was the result of passion or prejudice or manifestly excessive given Magnum's expert's testimony. Having reviewed the record, we cannot conclude that the damage award is against the manifest weight of the evidence. Therefore, G. Mink's third assignment of error is overruled.

<u>G. Mink's Assignment of Error Number Four</u>

THE TRIAL COURT ABUSED ITS DISCRETION IN OVERRULING DEFENDANTS' OBJECTIONS TO PLAINTIFF'S SPECULATIVE EXPERT TESTIMONY CONCERNING FUTURE LOST PROFITS.

**{¶33}** In his fourth assignment of error, G. Mink argues that the trial court abused its discretion by allowing Magnum's expert to testify with regard to the projected future profits Magnum lost as a result of G. Mink's having tortiously interfered with Magnum's contractual relations. We disagree.

**{¶34}** Initially, we note that G. Mink does not argue that Magnum's expert was not qualified to testify or that his testimony failed to satisfy Evid.R. 702. Instead, he argues that the court should have excluded the expert's future damage projections because they were purely speculative, did not conform to the evidence, and did not provide the jury with any reasonably certain basis for awarding damages. *See Circuit Solutions, Inc. v. Mueller Elec. Co.*, 9th Dist. No. 05CA008775, 2006-Ohio-4321, ¶ 7 ("The amount and existence of lost profits must be established with reasonable certainty."). We, therefore, limit our review to G. Mink's specific argument.

**{¶35}** "The admission or exclusion of expert testimony lies in the sound discretion of the trial court and will, therefore, not be overturned absent an abuse of that discretion." *State v. Bekelesky*, 9th Dist. No. 24976, 2010-Ohio-2198, ¶ 6. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When reviewing for an abuse of discretion, an appellate court may not merely substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶36}** Robert Ranallo, a CPA, certified valuation analyst, and accredited business valuator, testified on behalf of Magnum. Ranallo testified that he has been projecting business damages for various companies since 1995 and previously has both consulted and testified as an expert in valuation cases involving the scrap steel industry. In analyzing Magnum's case, Ranallo reviewed several years' worth of Magnum's financial documents, including its monthly profit reports, income statements, and the expense reports from the trading division. Ranallo also reviewed FerroTrade's projected sales and projected gross profit margin, as reported by G. Mink in the mission statement that he created for his company. Moreover, Ranallo

independently researched the scrap steel market to gain background information about its activity and volatility.

{¶37} Using all of the information he gathered, Ranallo testified that he used the sales projection method to arrive at a damages measurement for Magnum. Ranallo used the actual month-to-month figures Magnum had for each of the ten customers at issue, averaged each over different measuring periods, selected a specific three-month measuring period representative of the averages he performed, and factored in the industry analysis that he performed. Ranallo testified that he then arrived at a total monthly gross profit loss for Magnum of $38,150 for the ten customers at issue, but also included the "individual components on a company-by-company basis that [made] up that total." Ranallo also performed a ten-year projection of Magnum's losses, deducting variable expenses and considering both costs and the time value of money. Ranallo testified that he organized the ten-year projection into one-year periods of time (with an estimated monetary amount for each year) so that the jury would have a future profits calculation for each year in the future up to ten years. Ranallo testified that he did not include in his projections the possibility that customers might leave Magnum of their own accord because it would be speculative to address potential causes of the loss of customers.

{¶38} Having reviewed the record and Ranallo's specific testimony, we cannot conclude that the trial court abused its discretion by allowing Ranallo to testify about Magnum's future lost profits. Ranallo explained his calculation method in detail for the jury and provided the jury with information about total losses as well as losses on a customer-by-customer basis. He also did not simply provide the jury with a ten-year projection. In addition to giving the jury information about Magnum's monthly loss, he gave the jury a projected damage amount per year for a period of ten years. Therefore, the jury had the option of awarding any number of years'

worth of damages up to and including ten years. The record does not support G. Mink's argument that Ranallo's testimony was purely speculative or divorced from the actual evidence introduced at trial.

{¶39} Ranallo based his projections on multiple sources, including Magnum's historical financial data over a period of several years and his own independent research about the scrap steel market. The record supports the trial court's decision to allow Ranallo's testimony as an aid to the jury in arriving at a damage award for Magnum's lost profits. G. Mink's argument that the trial court should have excluded Ranallo's testimony lacks merit. Consequently, his fourth assignment of error is overruled.

<u>Magnum's Assignment of Error Number One</u>

THE TRIAL COURT ERRED IN DENYING MAGNUM'S MOTION FOR JNOV ON MAGNUM'S CLAIM OF UNJUST ENRICHMENT AGAINST MR. MINK.

{¶40} In its first assignment of error, Magnum argues that the trial court erred by denying its motion for JNOV with regard to its claim for unjust enrichment. We disagree.

{¶41} This Court reiterates the standard of review for an appeal from the denial of a motion for JNOV. As with an appeal from a court's ruling on a directed verdict, this Court reviews a trial court's grant or denial of a JNOV de novo. *Williams*, 2008-Ohio-1467, at ¶ 9. "JNOV is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the nonmoving party reasonable minds could come to but one conclusion, that being in favor of the moving party." *Id.* at ¶ 9, citing Civ.R. 50(B). If reasonable minds could reach different conclusions, the motion must be denied. *Garcea*, 2002-Ohio-2437, at ¶ 10.

{¶42} Magnum brought suit against G. Mink for both promissory estoppel and unjust enrichment. "To succeed on a promissory estoppel claim, a party must show (1) a clear and unambiguous promise; (2) reliance on that promise; (3) reliance that was reasonable and foreseeable; and (4) damages caused by that reliance." *Current Source, Inc. v. Elyria City School Dist.*, 157 Ohio App.3d 765, 2004-Ohio-3422, ¶ 31 (9th Dist.). "A successful claim of unjust enrichment requires that: (1) a benefit has been conferred by a plaintiff upon a defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Chef Italiano v. Crucible Dev. Corp.*, 9th Dist. No. 22415, 2005-Ohio-4254, ¶ 26. Unjust enrichment occurs when a person "has and retains money or benefits which in justice and equity belong to another." *Bldg. Industry Consultants, Inc. v. 3M Parkway, Inc.*, 182 Ohio App.3d 39, 2009-Ohio-1910, ¶ 16 (9th Dist.), quoting *Hummel v. Hummel*, 133 Ohio St. 520, 528 (1938).

{¶43} The jury found G. Mink liable for both promissory estoppel and unjust enrichment. Whereas the jury awarded Magnum $115,926.51 on its promissory estoppel claim, however, the jury did not award Magnum any damages on its unjust enrichment claim. Magnum argues that it was entitled to a $33,717.82 award on its unjust enrichment claim because the parties stipulated that Magnum reimbursed G. Mink for unauthorized business expenses in that amount during his tenure with the company.

{¶44} Initially, we note that Magnum's argument is essentially that its damage award was inadequate. This Court previously has stated that "[s]uch an argument is not appropriate on a motion for [JNOV] because Civ.R. 50(B) provides the means to challenge the jury's verdict, not the jury's award of damages." *Jemson v. Falls Village Retirement Community, Ltd.*, 9th Dist. No. 20845, 2002-Ohio-4155, ¶ 17. *Accord Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-

3957, ¶ 25 (9th Dist.). Instead, Civ.R. 59 provides litigants with an avenue to challenge damage awards in the form of a motion for a new trial. *See* Civ.R. 59(A)(4). Magnum never filed a motion for a new trial, so we question whether, under *Jemson*, Magnum preserved its argument for appeal. Nevertheless, we acknowledge that we have considered an appeal from the denial of a motion for JNOV where the appellant sought an increased damage award on the basis that the parties had stipulated to damages. *See Kane v. O'Day*, 9th Dist. No. 23225, 2007-Ohio-702, ¶ 23-25. Because we conclude that the trial court properly denied Magnum's motion for JNOV, we merely note the issue at this time and assume for purposes of our analysis that Magnum's argument is properly before us.

{¶45} G. Mink testified that Magnum routinely reimbursed him for the business expenses that he reported while working there. He admitted that Magnum had reimbursed him for certain expenses he reported that were not authorized expenses. He testified that he had reviewed his expense reports from December 2004 to August 2009 and determined that Magnum had reimbursed him for $23,717.82 in unauthorized expenses. Moreover, he agreed that total could be $5,000 to $10,000 higher because he was sure there were more unauthorized expenses that he missed when reviewing his expense reports for trial. The parties later stipulated that "the additional sums that were listed as business expenses * * * that were not actual business expenses were somewhere between $5,000 and $10,000 worth."

{¶46} According to Magnum, the trial court erred by denying its motion for JNOV because the parties stipulated to damages in the amount of $33,717.82 should the jury find G. Mink liable for unjust enrichment. *See, e.g., Kane*, 2007-Ohio-702, at ¶ 23-25 (court erred by denying JNOV where parties had stipulated to the amount of damages in the event the jury found the defendant liable). We do not agree that the parties stipulated to $33,717.82 in damages. G.

Mink identified $23,717.82 in unauthorized expenses. The parties then stipulated that "somewhere between $5,000 and $10,000 worth" of additional unauthorized expenses existed. There was no stipulation that the damage amount was, in fact, $33,717.82.

{¶47} G. Mink argues that a zero dollar award was the appropriate measure of damages on Magnum's unjust enrichment claim because that claim and Magnum's promissory estoppel claim were alternative theories for relief. G. Mink avers that any additional damages awarded on Magnum's unjust enrichment claim would result in a double recovery because Magnum recovered on its promissory estoppel claim. According to Magnum, its unjust enrichment claim differed from its promissory estoppel claim because its unjust enrichment claim sought repayment for G. Mink's unauthorized business expenses while its promissory estoppel claim sought repayment for the deficit the trading division accrued during G. Mink's last year with the company. For purposes of context, we set out the evidence that supports Magnum's construction of its promissory estoppel claim.

{¶48} G. Mink testified that he approached Giorgi in August 2008 about adopting a new compensation structure for the traders. Giorgi adopted G. Mink's proposal and agreed to a sliding scale percentage structure. Under the new structure, the higher the amount of revenue the traders earned, the higher the percentage of that revenue the traders would receive as commission. As part of the new structure, however, G. Mink agreed that all of the expenses attributable to the trading division each month, including the traders' salaries, would first be deducted from the revenues they earned. Any commission, therefore, equaled the revenue, minus the expenses, times the percentage rate that applied. By way of example, G. Mink agreed that if the traders brought in $100,000 for the month and had $50,000 in expenses, they would

receive $10,000 in commission because a 20% commission rate applied in that instance ($100,000 revenue - $50,000 expenses X 20% commission rate = $10,000).

{¶49} G. Mink agreed that the new compensation structure almost immediately resulted in a deficit balance because the price of scrap declined dramatically and the trading division did not have enough revenue to cover its expenses. He further agreed that, as of the end of September 2009, the deficit balance amounted to $115,926.51. According to Giorgi, Magnum allowed the deficit to build in the manner that it did because G. Mink gave Giorgi several assurances that he would personally pay the deficit if the scrap market did not recover. The jury awarded Magnum $115,926.51 on its promissory estoppel claim; the exact amount of the deficit owed at the time of G. Mink's termination.

{¶50} Even if evidence would theoretically support a claim or defense, a court's ruling on a motion for JNOV must necessarily be constrained by the actual claims or defenses that were presented to the jury. *See Glenmoore Builders, Inc. v. Smith Family Trust*, 9th Dist. No. 24299, 2009-Ohio-3174, ¶ 40, 46-47 (denial of JNOV affirmed when litigant failed to submit a statute of frauds defense to the jury through jury instructions and did not challenge the court's instruction that the parties had agreed there was a contract). On appeal, Magnum asserts that it was entitled to damages for both its promissory estoppel and unjust enrichment claims because they were separate and distinct. Having reviewed the record, however, we cannot agree that Magnum made that distinction for the jury.

{¶51} In instructing the jury on promissory estoppel, the court instructed:

Magnum claims that defendant [G.] Mink promised Magnum that in exchange for advanced funds, he would procure customers and business for Magnum. Magnum claims that it relied upon this promise and Mr. Mink should be bound even if no contract was made between them.

In instructing the jury on unjust enrichment, the court instructed:

Magnum claims that it is entitled to recover the reasonable value of funds it advanced to [G.] Mink in exchange for his promise to procure customers and business for the benefit of Magnum.

Although the court also instructed the jury on the elements of promissory estoppel and unjust enrichment, the foregoing instructions for the claims did not differ in any meaningful way. Both sought the return of funds that Magnum advanced to G. Mink and neither identified those specific funds. Similarly, the interrogatories given to the jury did not link any specific funds to the two claims. The interrogatories only asked the jury whether Magnum proved each claim by a preponderance of the evidence and, if so, the amount of money Magnum was entitled to recover on its respective claims.

{¶52} Perhaps most telling is the response that the jury was given on one of the questions it submitted during deliberation. The jury's question was:

Is promissory estoppel and/or unjust enrichment referring to the $23,000-33,000 of expenses being sought after? If not, what do they mean?

The answer provided to the jury was:

The promissory estoppel and unjust enrichment claims relate only to defendant [G.] Mink and they deal with the compensation deficit and expense report contentions.

Accordingly, the jury was not told that one claim encompassed the deficit while the other encompassed the unauthorized business expenses. Rather, the jury was told that both claims encompassed both the deficit and the expenses. Magnum did not object to any of the jury instructions or interrogatories given or take issue with the answer provided to the jury in response to the jury's question.

{¶53} The record supports the conclusion that Magnum presented the jury with alternative theories for relief and the jury only intended to award Magnum $115,926.51.

Therefore, the trial court did not err by denying Magnum's motion for JNOV. Magnum's first assignment of error is overruled.

Magnum's Assignment of Error Number Two

THE TRIAL COURT ERRED IN DENYING MAGNUM'S MOTION FOR PREJUDGMENT INTEREST ON MAGNUM'S PROMISSORY ESTOPPEL CLAIM.

**{¶54}** In its second assignment of error, Magnum argues that the trial court erred by denying its motion for prejudgment interest on the $115,926.51 award it received on its claim for promissory estoppel. We agree.

**{¶55}** "R.C. 1343.03(A) establishes interest rates for both prejudgment and post-judgment interest in actions based on contract." (Internal quotations and citations omitted.) *Rutledge v. Lilley*, 9th Dist. No. 09CA009691, 2010-Ohio-2275, ¶ 10. The statute provides, in relevant part, as follows:

> In cases * * * when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of * * * a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to [R.C.] 5703.47 * * *.

R.C. 1343.03(A). "Once a plaintiff prevails on a contract claim, the trial court must award the party prejudgment interest." *Desai*, 177 Ohio App.3d 679, 2008-Ohio-3957, at ¶ 31. The award is mandatory and not a matter of the court's discretion. *Id.* "The only matter within the court's discretion is the determination of the starting date upon which to begin calculating the prejudgment interest." *Id.*, citing *Zeck v. Sokol*, 9th Dist. No. 07CA0030-M, 2008-Ohio-727, ¶ 46.

**{¶56}** Magnum argues that it was entitled to prejudgment interest on its promissory estoppel claim because the claim "was based upon a verbal contract between Magnum and [G.]

Mink." G. Mink counters that prejudgment interest under R.C. 1343.03(A) cannot be awarded on a promissory estoppel claim because promissory estoppel is not a contractual theory. *See Glenmoore Builders, Inc.*, 2009-Ohio-3174, at ¶ 42, quoting *Gevedon v. Gevedon*, 167 Ohio App.3d 1, 2006-Ohio-2668, ¶ 21 (2d Dist.), fn. 3 ("Quasi-contract claims such as unjust enrichment and promissory estoppel apply in the absence of a contract * * *.").

**{¶57}** This Court has held that a claim for promissory estoppel "effectively creat[es] a contract where none existed." *Telxon Corp. v. Smart Media of Delaware, Inc.*, 9th Dist. Nos. 22098 & 22099, 2005-Ohio-4931, ¶ 58, quoting *Strickler v. Keycorp*, 8th Dist. No. 80727, 2003-Ohio-283, ¶ 18. Moreover, although unjust enrichment is also only a quasi-contractual claim, this Court has concluded that prejudgment interest under R.C. 1343.03(A) is available on a claim for unjust enrichment. *See Desai* at ¶ 32; *Zeck* at ¶ 43-47. We see no reason to distinguish between a claim of promissory estoppel and a claim of unjust enrichment for purposes of R.C. 1343.03(A)'s application. Therefore, we conclude that a party who prevails on a claim of promissory estoppel may seek a prejudgment interest award under R.C. 1343.03(A).

**{¶58}** The trial court determined that Magnum was not entitled to prejudgment interest because G. Mink had a good faith basis to contest liability for the deficit that resulted after he and Giorgi agreed to a new compensation structure. It further noted that G. Mink had offered a six-figure settlement, "which was largely the result of the deficit," but that Magnum had rejected his offer. The court did not offer any additional rationale for denying Magnum's motion.

**{¶59}** While a request for prejudgment interest under R.C. 1343.03(C) requires consideration of a party's good faith efforts to settle a case, a request under R.C. 1343.03(A) does not. *Desai* at ¶ 31. To obtain prejudgment interest under R.C. 1343.03(A), a party need only have prevailed on a contract claim. *Id.* At that point, prejudgment interest is mandatory

and the only question is "the determination of the starting date upon which to begin calculating the prejudgment interest." *Id.* "The award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment * * *." *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110 (1995), syllabus. "Each case involves different facts * * * and it is the job of the trial court to determine the appropriate starting date based on the evidence before it." *Hutchinson v. State Auto Ins. Co.*, 9th Dist. No. 20636, 2002 WL 121202, *2 (Jan. 30, 2002).

{¶60} The trial court erred by refusing to award Magnum prejudgment interest on the grounds that G. Mink had a good faith basis to contest liability and made a good faith settlement offer. Magnum prevailed on its promissory estoppel claim, so it was entitled to prejudgment interest. The only question is the amount of prejudgment interest to which Magnum was entitled. Because the start date of Magnum's prejudgment interest period is a matter of discretion for the trial court, this Court will not make that determination in the first instance. *See BCI v. DeRycke*, 9th Dist. No. 21459, 2003-Ohio-6321, ¶ 20. Instead, we must remand this matter to the trial court for it to exercise its discretion and select a start date for Magnum's prejudgment interest. *Id.* Magnum's second assignment of error is sustained on that basis.

### Magnum's Assignment of Error Number Three

THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING $66,036.50
IN ATTORNEYS' FEES TO MAGNUM.

{¶61} In its third assignment of error, Magnum argues that the trial court abused its discretion in only awarding it $66,036.50 in attorney fees. We disagree.

{¶62} "[I]n Ohio, it is an established principle of law that if punitive damages are awarded, the aggrieved party may also recover reasonable attorney fees." *LaFarciola v. Elbert*, 9th Dist. No. 08CA009471, 2009-Ohio-4615, ¶ 10. "A trial court's determination in regards to

an award of attorney fees will not be disturbed on appeal absent an abuse of discretion." *Jarvis*, 2008-Ohio-3313, at ¶ 33, quoting *Crow v. Fred Martin Motor Co.*, 9th Dist. No. 21128, 2003-Ohio-1293, ¶ 38. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. When reviewing for an abuse of discretion, an appellate court may not merely substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

**{¶63}** "The reasonableness of attorney[] fees is determined with respect to the factors set forth in Rule 1.5(a) of the Ohio Rules of Professional Conduct * * *." *Cambridge Co., Ltd. v. Telstat, Inc.*, 9th Dist. No. 23935, 2008-Ohio-1056, ¶ 19. The rule provides that:

> [t]he factors to be considered in determining the reasonableness of a fee include * * *
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]
>
> (8) whether the fee is fixed or contingent.

Prof.Cond.R. 1.5(a)(1)-(8). "[The] trial court maintains discretion to make the determination as to what [attorney] fee award is reasonable in light of all the facts and circumstances of the case." *Mauger v. Inner Circle Condominium Owners Assn.*, 9th Dist. No. 10CA0046-M, 2011-Ohio-1533, ¶ 26, quoting *Jerels v. Begue*, 9th Dist. No. 24700, 2010-Ohio-1964, ¶ 13.

{¶64}   Magnum was represented by two attorneys throughout the course of the litigation: Jeffrey Dunlap and Paul Harris.  In their fee request, Magnum's attorneys sought fees in the amount of $398,881.41.  The fee request included a copy of the billing invoice for all the work Dunlap and Harris' firm performed for Magnum as well as copies of the monthly invoices Dunlap and Harris submitted to Magnum.  The monthly invoices detail the hours expended by each person on specific days during the month.  In reviewing the monthly invoices, the trial court reduced the total amount of fees Dunlap and Harris sought to $374,193.00.  It is apparent from the record that the court did so because the total billing invoice amount ($398,881.41) includes charges for individuals apart from Dunlap and Harris.  The monthly invoices reference those individuals by name, but Magnum made no attempt to discuss those individuals at the attorney fee hearing.  Moreover, Magnum has not argued on appeal that the trial court erred by reducing the total fee amount requested from $398,881.41 to $374,193.00.  Therefore, in performing our analysis, we rely upon the $374,193.00 amount as the amount representing Magnum's fee request.

{¶65}   Dunlap and Harris reported in their fee request that Dunlap expended 410.4 hours' worth of work representing Magnum and Harris expended 780.3 hours.  At the fee hearing, Dunlap reported that his hourly rates were as follows: (1) $400 per hour in 2009; (2) $415 per hour in 2010; and (3) $425 per hour in 2011.  Dunlap further reported Harris' hourly rates as follows: (1) $230 per hour in 2009; (2) $250 per hour in 2010; and (3) $275 per hour in 2011.  There was testimony at the hearing that Dunlap had graduated from law school in 1989, had worked in both Chicago and Cleveland, and had handled many cases similar to the one at issue in the past.  Meanwhile, Harris had graduated from law school in 2005, had worked at his current firm since graduating, and had been involved in a handful of trials.

{¶66} Two experts testified at the fee hearing after the parties stipulated to their expertise. Magnum's expert, Ronald Kopp, testified that for the last 23-25 years he had focused his practice on business litigation and that his personal hourly rate was $390 per hour. Kopp testified that his fee was as high as any business litigator in the Akron area, but that he was aware of higher fees in the Northeast Ohio area in general. Kopp opined that both Dunlap and Harris had charged reasonable fees. He further opined that the hours both attorneys had expended were reasonable given the complexity of the case, the litigation stakes, and their need to familiarize themselves with both Magnum as a specific client and the scrap steel industry in general.

{¶67} G. Mink's expert, Mark Bernlohr, testified that he had been practicing for 24 years, dealt primarily with litigation and commercial law, and personally charged an hourly rate between $175 and $250 an hour. Bernlohr admitted that his hourly rate was "[p]robably a little low[,] but * * * acceptable in Summit County." Bernlohr opined that both Dunlap and Harris had charged an excessive hourly rate and that an hourly rate of $325 would be reasonable for an attorney with Dunlap's experience while an hourly rate of $185 would be reasonable for an attorney with Harris' experience. Bernlohr further opined that Dunlap and Harris expended too many hours given the relatively straightforward nature of the case and various other factors. According to Bernlohr, it would have been reasonable for Dunlap to expend 350 hours on the case (rather than 410.4 hours) and for Harris to expend 390 hours on the case (rather than 780.3 hours).

{¶68} In addition to its judgment entry, the trial court issued an extremely detailed memorandum of opinion regarding its award of attorney fees. The memorandum reflects that the trial court relied extensively upon *Hensley v. Eckerhart*, 461 U.S. 424 (1983), in reaching its decision. In *Hensley*, the United States Supreme Court wrote that:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

*Hensley* at 433. The Supreme Court further wrote that a trial court may reduce the number of hours reported when the documentation for those hours is inadequate or the hours were not reasonably expended because they were "excessive, redundant, or otherwise unnecessary." *Id.* at 433-434. Following *Hensley*, the trial court here began its analysis by reviewing the reasonableness of Dunlap's and Harris' hourly rates and the number of hours each expended.

{¶69} The trial court determined that although Dunlap's hourly rate was "at the high end of the range of acceptable rates" for the locality, it was reasonable given his skill level. The court further determined that Dunlap had expended a reasonable number of hours. Therefore, as a starting point, the court concluded that the initial estimate for Dunlap's services amounted to $171,646 (410.4 hours X the $400-$425 rate in place for 2009, 2010, and 2011).

{¶70} As to Harris, the trial court determined that his hourly rate and the number of hours he expended were unreasonable. Specifically, the court determined that an hourly rate of $230-275 was excessive for a "four- to six-year attorney[] practicing in this jurisdiction." The court agreed with G. Mink's expert that $185 was a reasonable hourly rate for Harris and adjusted his rates accordingly. As to the hours Harris expended, the court did not adopt Bernlohr's suggestion that Harris' hours should be cut in half. Instead, the court reduced Harris' hours from 780.3 to 500 hours. The court reasoned that a reduction in hours was appropriate because the monthly invoices showed that Harris had expended more time than necessary on various tasks and had charged for performing work "that could have been performed by a paralegal or a legal secretary." Therefore, as a starting point, the court concluded that the initial estimate for Harris' services should have been $92,500 (500 hours X $185). Combining the

initial estimates for Dunlap and Harris, the trial court determined that the initial estimate for the value of their services should have been $264,146.

**{¶71}** Magnum argues that the trial court abused its discretion by reducing the number of hours "charged by Mr. Dunlap and Mr. Harris." The court, however, did not reduce Dunlap's reported number of hours. The court agreed with the reasonableness of both Dunlap's hourly rate and the number of hours he expended. The only reductions the trial court made were with regard to Harris. With respect to those reductions, the court relied on Bernlohr's expert testimony as well as its own review of the monthly invoices.

**{¶72}** Bernlohr testified that Harris had only been in practice since 2005, was still an associate with his firm, and had only tried a handful of cases. Specifically, Harris had appeared as second chair in three jury trials, including this case, and had acted as lead counsel in two to three bench trials. Bernlohr researched those bench trials and found that they were small cases involving less than $10,000. Applying his expertise to Harris' background, Bernlohr arrived at a $185 hour figure as a reasonable hourly rate for Harris' services.

**{¶73}** As to the number of hours Harris expended, Bernlohr testified that the hours were excessive for several reasons. First, the hours were excessive given that Harris and Dunlap had both charged for repeated conferences they had with one another. Second, Bernlohr felt that it was unreasonable for Harris to have billed "nearly three weeks, eight hours a day, getting ready for a six-day trial." Third, Bernlohr observed that some of the work Harris did could have been performed by a law clerk or paralegal, but Harris "was basically doing everything." Bernlohr ultimately concluded that it would be appropriate to exclude half of Harris' hours.

**{¶74}** Having reviewed the record, we cannot conclude that the trial court abused its discretion by reducing Harris' hourly rate and the number of hours he expended. Bernlohr's

testimony supported the rate reduction. Moreover, although Bernlohr suggested reducing Harris' hours from 780.3 to 390 hours, the court only reduced Harris' hours to 500 hours. The court specified that it had conducted its own review of the monthly invoices and found a reduction appropriate because Harris' hours were "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. Magnum has not shown that the court's initial estimation of the value of Dunlap and Harris' services amounted to an abuse of discretion.

{¶75} Once the court arrived at an initial determination of $264,146 as the starting point for the value of Dunlap and Harris' legal services, the court then further reduced the fee award. As the Supreme Court explained:

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the [trial] court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief.

*Id.* "[W]ork on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved." (Internal quotations and citations omitted.) *Id.* at 435. Additionally, if a party is only entitled to recover its attorney fees on a particular claim, the court must decide whether to reduce the fee award to the fees attributable to that particular claim. "[T]he court may award fees for the total work performed if the prevailing party's claims present 'a common core of facts and related legal theories.'" *Fleischer v. George*, 9th Dist. No. 09CA0057-M, 2010-Ohio-3941, ¶ 32, quoting *Parker v. I & F Insulation Co., Inc.*, 1st Dist. No. C-960602, 1998 WL 144510, *6 (Mar. 27, 1998). If, however, "the claims for which fees are allowable are distinct from claims for which fees are not awarded," the court must separate the fees and award only those fees that are allowable. *Fleischer* at ¶ 32. "[T]he fee applicant bears the burden of

establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.

{¶76} In reaching its decision that Magnum's fee award should be further reduced, the court considered both the results Dunlap and Harris obtained for their client and the number of successful claims for which fees were awardable. Magnum brought a total of 11 claims against the defendants in this case. Four claims were eliminated by virtue of either a judgment on the pleadings or a directed verdict and two claims resulted in a verdict in favor of the defendants. Of the five remaining claims, Magnum did not prevail against J. Mink or FerroTrade at all. Magnum's compensatory damages were limited to: (1) a $30,000 verdict against G. Mink and Shupe on its trade secret misappropriation claim; (2) a $219,355.07 verdict against G. Mink on its claim for tortious interference with contractual relations; and (3) a $115,926.51 verdict against G. Mink on its promissory estoppel claim.

{¶77} Magnum's entitlement to attorney fees in this case arose strictly from the jury's determination that G. Mink was liable for punitive damages. The jury, however, only found G. Mink liable for punitive damages on one of its claims; the claim for tortious interference with contractual relations. As to that claim, the jury awarded $219,355.07 in compensatory damages and $110,000 in punitive damages. The trial court noted that neither expert had been able to determine the number of billable hours that related to Magnum's claim for tortious interference with contractual relations because Dunlap and Harris had not reported their hours in that manner. Both employed a block billing method and documented their hours in a generalized manner such that it was not possible to segregate their work on a particular claim. Yet, the court noted that Magnum's claims essentially fell within two categories: (1) those that arose from the allegations that the defendants took confidential information, solicited business for themselves while still in

Magnum's employ, and interfered with existing contracts and business relationships; and (2) those that arose from G. Mink's failure to pay the trading division's deficit and his own unauthorized business expenses. The court further noted that the claim for which attorney fees were eligible only fell within the first category of claims; a category that would include a $30,000 award on the trade secret misappropriation claim and a $219,355.07 award on the claim for tortious interference with contractual relations.

{¶78} The trial court determined that Magnum had sought between $1.2 and $1.3 million on its claim for tortious interference with contractual relations, but only had recovered $219,355.07. Similarly, Magnum had sought between $1.2 and $1.3 million on its trade secret misappropriation claim, but only had recovered $30,000. As a result of those figures as well as the outcome of all of the claims discussed above, the court found that Magnum enjoyed only "partial or limited success" in the litigation and that it was appropriate to reduce its fee award. The court then determined that it was appropriate to reduce Magnum's fee award by 75%, a percentage that Bernlohr testified would "approximate the amount by which the jury reduced the damages sought on the tortious interference claim." Applying that reduction to its initial estimation of $264,146, then, the trial court awarded Magnum $66,036.50 in attorney fees.

{¶79} If a trial court determines that a fee award must be reduced it "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley*, 461 U.S. at 436-437. The trial court here exercised its discretion and reduced Magnum's award to account for its limited success. Having thoroughly reviewed the record, we cannot conclude that the trial court abused its discretion by awarding Magnum $66,036.50 in attorney fees. Magnum's argument to the contrary lacks merit.

**{¶80}** Magnum's brief also includes an argument that the trial court erred by denying Magnum's request for $40,649.54 in expert witness fees. Expert fees, however, are distinct from attorney fees. Magnum's captioned assignment of error only challenges the court's attorney fee award. Magnum also has not explained why a punitive damage award would entitle it to its expert fees. *See Bryant v. Walt Sweeney Automotive, Inc.*, 1st Dist. Nos. C-010395 & C-010404, 2002-Ohio-2577, ¶ 42 ("The Ohio Supreme Court has held that litigation expenses cannot be taxed as costs, unless specifically provided for by statute."); *Younger v. Buckeye Local Sch. Dist.*, 9th Dist. Nos. 2060 & 2065, 1992 WL 161163, *4 (July 8, 1992) ("A party's expert witness fee is not taxable as costs to be assessed to the losing party."). We, therefore, will not entertain Magnum's argument that the trial court erred by not awarding Magnum its expert witness fees. Magnum's third assignment of error is overruled.

### III

**{¶81}** G. Mink's assignments of error are overruled. Magnum's first and third assignments of error are overruled, and its second assignment of error is sustained for the reasons set forth above. Roderick Linton Belfance, LLP's motion to withdraw as counsel for Shupe is granted. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

LAWRENCE R. BACH, and DAVID S. NICHOL, Attorneys at Law, for Appellant/Cross-Appellee.

JEFFREY S. DUNLAP and PAUL R. HARRIS, Attorneys at Law, for Appellee/Cross-Appellant.