[Cite as *Coeurvie v. McGonigal*, 2017-Ohio-2634.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| SHARRON COEURVIE | | C.A. No. 27981 |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| RICHARD M. MCGONIGAL, et al. | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellees | | CASE No. CV 2012 01 0487 |

DECISION AND JOURNAL ENTRY

Dated: May 3, 2017

HENSAL, Presiding Judge.

{¶1} Sharron Coeurvie appeals from the judgment of the Summit County Court of Common Pleas. We affirm.

I.

{¶2} This case involves the presence of mold in a rental property, and the landlords' alleged negligence associated therewith. Defendants-Appellees, Rick and Wendy McGonigal (collectively, "Landlords"), purchased a house in Richfield, Ohio in 2006, and lived there with their young children until they moved to Florida in 2009. After they moved, they leased the house to another family with young children. That family lived in the house from May 2009 until March 2010.

{¶3} Plaintiff-Appellant, Sharron Coeurvie ("Tenant"), who was living in Illinois at the time, arranged to tour the house in March 2010. Because Landlords lived in Florida, they arranged to have Rick McGonigal's father, Chuck, show Tenant the house. During the tour,

Tenant allegedly observed mold in a cupboard near the bathroom, as well as mold near a window in the master bedroom, and informed Chuck regarding same. Chuck, however, denied that Tenant ever informed him that she saw mold in the house. Regardless, Tenant thought the house was "beautiful" and executed a lease beginning on April 15, 2010. Although she moved some of her belongings into the house in April, Tenant did not live there full-time until September 2010. During those months, Tenant commuted between Illinois and Richfield approximately every two weeks.

{¶4}    Tenant and Landlords enjoyed a cordial relationship for some time. The cordial relationship, however, ended in February 2011. On February 15, 2011, Tenant emailed Landlords, indicating that there was "some serious leakage into the house" that she needed to tell them about, although she "didn't think it was going to be a big problem[.]" That leakage pertained to mustiness and dampness that Tenant observed in the cupboard near the bathroom. On February 19, 2011, Tenant emailed Landlords again, indicating that the cupboard was wet, and that she had to remove and wash everything inside. Tenant emailed Landlords yet again on February 23, 2011, indicating that the cupboard had mold in it. According to Mr. McGonigal, this was the first time Tenant mentioned anything about mold in the house.

{¶5}    Landlords directed Chuck, who lived nearby and often performed repairs at the house, to investigate the leak into the cupboard. Chuck observed signs of moisture in the cupboard, which he attributed to a roof leak. Due to snow accumulation on the roof, Chuck was unable to investigate further until the snow thawed. In the meantime, Chuck opened the cupboard and placed a dehumidifier nearby. A few days later, Chuck was able to get onto the roof and fix the source of the problem.

{¶6} On February 24, 2011, Tenant emailed Landlords, indicating that she had become sick from the mold in the house, and that she was staying with friends. At Landlords' expense, Tenant hired a gentleman to test for mold on February 28, 2011. Because Tenant believed that the cupboard was the only problem area, she did not have him test for mold elsewhere in the house. That gentleman's testing revealed no mold in the cupboard.

{¶7} Later that day, Sue Cummings from the Summit County Health Department came to look at the house in response to a complaint lodged by Tenant. While there, Ms. Cummings observed mold in the bathroom area, which she testified was probably due to moisture from the shower, as well as mold in the basement. She also observed flooding in a back room in the basement. Despite the presence of mold, Ms. Cummings testified that the house was not uninhabitable. She further testified that she never received any prior complaints regarding the house. Later, Tenant would testify that although she did her laundry in the basement on a weekly basis, she did not know about the mold or flooding in the basement prior to Ms. Cummings' investigation.

{¶8} After Ms. Cummings left, Tenant called Airguard Restoration, a mold testing company, which was able to test for mold that same day (February 28, 2011). Those results revealed high levels of mold in the basement, and lower levels of mold elsewhere in the house. The Airguard Restoration representative also observed 1-4 inches of standing water in a back room in the basement, which he attributed to the fact that the sump pump had stopped working. Tenant testified that she did not know that the sump pump had stopped working until that day.

{¶9} Tenant did not communicate the results of the mold testing to Landlords, nor did she inform them of the flooding in the basement or the fact that the sump pump had stopped working. According to Tenant, she asked the Airguard Restoration representative and Ms.

Cummings to communicate that information to Landlords "so there would be no animosity." Indeed, Landlords emailed Tenant on March 1, 2011, requesting an update. Tenant responded the following day, indicating that there was "no information yet on the mold." Landlords testified that they did not learn of the flooding or mold in the basement until they received a letter from Ms. Cummings later in March. That letter indicated that mold was present in the basement and in the bathroom, and that there was about an inch of water in one of the rooms in the basement. The letter directed Landlords to remedy the situation within 30 days of receipt of the letter.

{¶10} Upon receiving the letter, Landlords immediately contacted Ms. Cummings to discuss the matter. They then contacted Chuck and directed him to replace the sump pump. Chuck did so, and also washed the basement walls with soap and water, which, according to Ms. Cummings' testimony, is how she advises people to remove mold. Chuck also applied a fresh coat of paint to the basement walls. Tenant, however, never resided in the house subsequent to February 24, 2011, and the lease terminated by its own terms shortly thereafter.

{¶11} Several months later, Tenant sued Landlords and their company, asserting claims for negligence, negligence per se for violating Revised Code Section 5321.04 by failing to maintain the premises in a reasonably safe and habitable condition, and negligence per se for violating Summit County Environmental Health Code Sections 1668.02 and 1668.07 by failing to maintain the premises in a weathertight, clean, and sanitary condition, and in good repair. Tenant's claims were based upon her allegations that she suffered severe adverse health effects due to her exposure to mold, including fatigue, tremors, bloating, headaches, stiff muscles, nausea, brain swelling, neck pain, forgetfulness, and mental fogginess, among other ailments.

Landlords filed a counterclaim for breach of the lease agreement relating to Tenant's failure to pay rent in March 2011.

{¶12} After a period of discovery, Landlords moved for summary judgment, arguing that no genuine issue of material fact remained as to their lack of knowledge or constructive knowledge of the presence of mold in the house prior to February 23, 2011, the day before Tenant vacated the premises. The trial court granted Landlords' motion, and Tenant appealed. This Court reversed the trial court's judgment, holding that "there was a material dispute as to whether [Landlords] should have known about the mold in this case." *Coeurvie v. McGonigal*, 9th Dist. Summit No. 27095, 2014-Ohio-4321, ¶ 14.

{¶13} The case then proceeded to a jury trial. On the morning of trial, Tenant dismissed Landlords' company as a party. During trial, Landlords dismissed their counterclaim for breach of the lease agreement with prejudice. After several days of testimony, the jury returned a verdict in favor of Landlords. Tenant subsequently filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, which the trial court denied. Tenant now appeals, raising four assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE JURY'S VERDICT IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} In her first assignment of error, Tenant argues that the jury's verdict was against the manifest weight of the evidence. We disagree.

{¶15} When reviewing the manifest weight of the evidence in a civil case, this Court:

weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the

[finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Alterations sic.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶16} "To prevail in a negligence action, the plaintiff must show (1) the existence of a duty, (2) a breach of that duty, and (3) an injury proximately resulting from the breach." *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, ¶ 21. The duties of a landlord are set forth in Section 5321.04(A). That Section requires landlords, in part, to:

> (1) Comply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety; (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition; (3) Keep all common areas of the premises in a safe and sanitary condition; (4) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by the landlord[.]

Section 5321.04(A)(1) through (4). A landlord's violation of this statute constitutes negligence per se. *Sikora v. Wenzel*, 88 Ohio St.3d 493, 497-498 (2000). A landlord will be excused from liability, however, if he "neither knew nor should have known of the factual circumstances that caused the violation." *Id.* at syllabus. A landlord is deemed to have constructive notice of a defect if it "'existed for such a length of time that the landlord, by exercising reasonable care, should have discovered it.'" *Coeurvie*, 9th Dist. Summit No. 27095, 2014-Ohio-4321, at ¶ 14, quoting *Waugh v. Lynch*, 8th Dist. Cuyahoga No. 100432, 2014-Ohio-1087, ¶ 10. "Factual circumstances[, however,] must exist that would prompt or require a landlord to investigate." *Robinson v. Akron Metro. Hous. Auth.*, 9th Dist. Summit No. 20405, 2001 WL 866275, *2 (Aug. 1, 2001).

**{¶17}** We will begin our analysis with a brief review of the pertinent evidence presented on behalf of Tenant, and Landlords' rebuttal of same. As previously noted, Tenant testified that she observed mold in two places (in a cupboard and near a window) during her tour of the house in March 2010, and that she pointed the mold out to Chuck. She testified she did not raise the issue again because she had "pointed it out to [Chuck]. That was it." Chuck, however, testified that Tenant never mentioned anything to him about mold.

**{¶18}** Tenant also presented expert testimony from an indoor environmentalist, who evaluated the test results of Airguard Restoration, and conducted her own testing at the house 28 months after Tenant vacated the premises. That expert concluded that the house showed historical water damage and mold, which appeared to have existed for decades. Landlords, in turn, presented testimony from an environmental consultant, who testified that the fact that Tenant's expert tested the house 28 months after Tenant vacated the premises rendered the expert's results unreliable. The environmental consultant also criticized Tenant's expert's failure to follow certain protocol.

**{¶19}** Tenant also presented expert medical testimony from a New York based physician who attributed Tenant's health issues to mold exposure. Landlords did not present any expert medical testimony to refute the physician's conclusions. Mr. McGonigal, however, testified that Tenant told him in April 2010 that she was feeling exhausted and sick from driving back and forth between Illinois and Ohio, and from working long days.

**{¶20}** Additionally, Tenant presented several photographs taken in February 2011 of the inside and exterior of the house, which showed a dark substance in certain areas. Tenant's counsel repeatedly referred to the darkness on the exterior of the house as mold despite the fact that no testing was performed to confirm whether mold was present and, if so, whether it was of

the hazardous variety. Nonetheless, Mr. McGonigal testified that he had experienced mildew on the exterior of the house in the past, which he would wash with soap and water.

{¶21} We now turn to the evidence presented on behalf of Landlords. Mr. McGonigal testified that he never observed mold in the house during the time he and his family lived there from 2006 to 2009. He also testified that he never observed water in the basement. He did admit, however, that they sometimes had moisture in the basement, and that they would run the dehumidifier from time to time. He also testified that he never received complaints from any tenants, including the tenants that lived in the house immediately prior to Tenant, regarding water in the basement or mold anywhere in the house. Mrs. McGonigal also testified that she never observed mold in the house, including the basement, which is where she did the laundry.

{¶22} As previously noted, a tenant who lived in the house immediately prior to Tenant also testified. She testified that she lived in the house from May 2009 to March 2010 with her then-husband and young children. She testified that she was very familiar with mold because she encountered it when she worked as a real estate agent. She testified that she never noticed mold in the house or water in the basement, which is where she did the laundry and where her husband stored his military gear.

{¶23} Having briefly summarized the pertinent evidence presented, we now turn to the merits of Tenant's argument that the jury's verdict was against the manifest weight of the evidence. The crux of Tenant's argument is that, because she presented unrebutted evidence as to each element of her causes of action, the jury's verdict was against the manifest weight of the evidence. In this regard, Tenant points to the fact that Landlords presented no medical evidence to rebut the testimony of her physician regarding Tenant's mold-related health issues, and also to the fact that Landlords did not have an expert perform mold testing to rebut the results of

Tenant's mold expert. Tenant's argument, however, ignores a critical – and dispositive – issue in this case: whether Landlords knew or should have known about the presence of mold in the house prior to when Tenant informed them of same. *Sikora*, 88 Ohio St.3d 493 (2002), at syllabus. As explained below, we cannot say that the jury clearly lost its way when it resolved this issue in favor of Landlords.

**{¶24}** The jury's verdict in this case indicates that it chose to believe Landlords' version of the events, which it was entitled to do. This is because "[c]redibility determinations are primarily within the province of the trier of fact[,]" who is "'free to believe all, part, or none of the testimony of each witness.'" *State v. Just*, 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, ¶ 42, quoting *State v. Cross*, 9th Dist. Summit No. 25487, 2011-Ohio-3250, ¶ 35. Here, the jury was free to believe Landlords' testimony that they never observed mold in the house, that they first learned of it when Tenant emailed them on February 23, 2011 (the day before she vacated the premises), and that they never observed water damage in the house. Likewise, the jury was free to believe the testimony of the tenant who lived in the house immediately prior to Tenant, who also testified that she never observed mold or water damage in the house.

**{¶25}** The jury was also free to disbelieve Tenant's testimony – which was contradicted by Chuck's testimony – that she observed mold when she toured the house in March 2010, and that she informed Chuck regarding same. *Id.* Additionally, the jury was free to reject the testimony of Tenant's indoor environmentalist expert (opining that the water damage and mold was historical), who did not conduct her own testing at the house until 28 months after Tenant vacated the premises.

{¶26} Having reviewed the record, we cannot say that the jury clearly lost its way when it determined that Landlords were not negligent. Accordingly, Tenant's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE COURT SHOULD HAVE GRANTED APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

{¶27} In her second assignment of error, Tenant argues that the trial court erred when it denied her motion for judgment notwithstanding the verdict. We disagree.

{¶28} We review a trial court's ruling on a motion for judgment notwithstanding the verdict de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4. Under Civil Rule 50(B), after the jury's verdict is entered in the trial court's judgment, the losing party may move to have the judgment set aside. Judgment notwithstanding the verdict pursuant to Civil Rule 50(B) "is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the nonmoving party reasonable minds could come to but one conclusion, that being in favor of the moving party." *Williams v. Spitzer Auto World, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9. If, however, "there is substantial evidence to support [the non-moving party's] side of the case, upon which reasonable minds may reach different conclusions, the motion [for judgment notwithstanding the verdict] must be denied." *Jackovic v. Webb,* 9th Dist. Summit No. 26555, 2013-Ohio-2520, ¶ 15, quoting *Osler v. City of Lorain*, 28 Ohio St.3d 345, 347 (1986). When considering a motion for judgment notwithstanding the verdict, a court must consider neither the weight of the evidence nor the credibility of the witnesses. *Osler* at syllabus.

{¶29} Tenant argues that, because Landlords conceded that mold was present in the house, sufficient evidence did not exist to support a defense verdict. Tenant's argument,

however, is misplaced. Landlords maintained that they had no knowledge of mold in the house prior to Tenant informing them on February 23, 2011. Conceding that mold was present in the house on February 23, 2011, however, did not establish that Landlords knew or should have known that mold was present in the house prior to that time. Thus, based upon the argument presented, we hold that the trial court did not err by denying Tenant's motion for judgment notwithstanding the verdict. Tenant's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE COURT SHOULD HAVE GRANTED APPELLANT'S MOTION FOR A NEW TRIAL.

**{¶30}** In her third assignment of error, Tenant argues that the trial court should have granted her motion for a new trial based upon the jury's verdict being against the weight of the evidence, and because defense counsel engaged in misconduct at trial. Given our disposition of Tenant's first assignment of error, we hold that the trial court did not err by denying Tenant's motion for a new trial based upon the verdict being against the weight of the evidence. Further, while Tenant claims that defense counsel engaged in misconduct, she cites no authority in support of her position that counsel's conduct was improper and necessitated a new trial, nor does she provide this Court with the applicable standard of review. App.R. 16(A)(7); Loc.R. 7(B)(7) of the Ninth District Court of Appeals. We, therefore, decline to address the merits of Tenant's argument. *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998), citing App.R. 12(A)(2) and 16(A)(7) ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out."). Accordingly, Tenant's third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY.

{¶31} In her fourth assignment of error, Tenant argues that the trial court erred by giving the jury an improper instruction. Specifically, she claims that the trial court erred when it used the word "significant" to modify the word "risk" as follows: "if [Landlords] knew or should have known by exercising reasonable care that there was toxic mold on the leased premises or that there was a *significant risk* that toxic mold would develop there, their failure to prevent or remedy that condition was negligence." (Emphasis added.) Tenant, however, fails to cite any authority in support of her position that the inclusion of the word "significant" was improper. *See* App.R. 16(A)(7). She simply concludes that it "raised the level of risk and was contrary to law." We, therefore, decline to address the merits of her argument. Accordingly, Tenant's fourth assignment of error is overruled.

## III.

{¶32} Sharron Coeurvie's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

TEODOSIO, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JOHN F. BURKE, III, Attorney at Law, for Appellant.

JAMES J. GUTBROD, Attorney at Law, for Appellee.