[Cite as *Schutte v. Fitzgibbon*, 2021-Ohio-2669.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

ROBERT SCHUTTE

    Appellant

    v.

BRIAN FITZGIBBON

    Appellee

C.A. No. 29686

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. CV-2015-04-2129

DECISION AND JOURNAL ENTRY

Dated: August 4, 2021

SUTTON, Judge.

**{¶1}** Plaintiff-Appellant, Robert Schutte, appeals the judgment of the Summit County Court of Common Pleas. For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

**{¶2}** This appeal arises due to an ongoing dispute between the City of Green and certain neighbors on Berna Road regarding a shared gravel driveway, known as Tim Drive. This shared gravel driveway was once owned and maintained by the City but has since been vacated and granted by easement to individual property owners. By way of this Court's previous decision in *Schutte v. Strittmatter*, 9th Dist. Summit No. 28886, 2018-Ohio-3472, ¶ 2-6, the relevant factual and procedural background in this matter is as follows:

> [Mr.] Schutte, along with his wife and daughter ("Schuttes"), filed a complaint involving a property dispute against the City of Green and several of the Schuttes' neighbors, including Counterclaim Plaintiff-Appellee, Brian Fitzgibbon. The matter was referred to a magistrate. After a denial of Mr. Fitzgibbon's motion to

dismiss the Schuttes' complaint, Mr. Fitzgibbon filed an answer and a compulsory counterclaim against Mr. Schutte arising out of the property dispute and alleging intentional interference with contractual relations and criminal acts against property pursuant to R.C. 2307.60.

The trial court eventually granted summary judgment to all of the defendants on each claim raised in the Schuttes' complaint. In a subsequent order the magistrate noted that Mr. Fitzgibbon's counterclaim remained outstanding and that the matter was scheduled for a bench trial. Mr. Schutte thereafter filed a "motion for clarification" asserting that although the magistrate had scheduled a bench trial in the matter, Mr. Fitzgibbon had filed a jury demand in his answer and counterclaim. Upon review of Mr. Fitzgibbon's answer and counterclaim, the magistrate found that no request or demand for trial by jury existed and denied Mr. Schutte's "motion for clarification" in a magistrate's order filed October 19, 2016. On October 24, 2016, Mr. Schutte filed an "objection to denial of right to jury trial."

The matter then proceeded to a bench trial before the magistrate. In a decision filed December 19, 2016, the magistrate determined that judgment should be granted to Mr. Fitzgibbon on the claims of intentional interference with a contract and criminal acts against property. On December 27, 2016, Mr. Schutte filed an objection to the magistrate's decision. Following a damages hearing, the magistrate filed a second magistrate's decision on April 18, 2017, awarding Mr. Fitzgibbon damages in the amount of $24,738.92. Both Mr. Schutte and Mr. Fitzgibbon filed objections to the April 18, 2017 magistrate's decision.

The trial court ultimately overruled both Mr. Schutte's and Mr. Fitzgibbon's objections and adopted the magistrate's decision in its entirety on July 27, 2017.

Because Mr. Schutte did not waive his constitutional right to a jury trial, this Court reversed and remanded the matter for further proceedings on Mr. Fitzgibbon's counterclaims. *Id*. at ¶ 15.

**The Fitzgibbon Counterclaims**

**{¶3}** As indicated above, Mr. Fitzgibbon filed two counterclaims against Mr. Schutte: (1) intentional interference with contractual relations; and (2) criminal acts against property. In his counterclaim for intentional interference with contractual relations, Mr. Fitzgibbon alleged he accepted an offer to purchase his property at 1806 Berna Road for $195,000.00, and, with knowledge of the existing contract, Mr. Schutte intentionally procured a breach of the contract "without privilege to do so or justification," thus causing damages to Mr. Fitzgibbon. Specifically,

Mr. Fitzgibbon alleged the buyers "abandoned the purchase" because Mr. Schutte approached them during a septic inspection shouting "buyer beware," falsely telling them "the septic was bad and had flooded the backyard," saying if they purchased the property "he would sue them," and promising to make their lives "nightmares" if they purchased the Berna Road property.

{¶4} Further, in his counterclaim for criminal acts against property, pursuant to R.C. 2307.60, Mr. Fitzgibbon alleged from 2012 to 2015, Mr. Schutte "removed or destroyed over 200 snow markers" placed by Mr. Fitzgibbon for the purpose of "demarcating the gravel road in winter." Mr. Fitzgibbon also alleged that, on January 9, 2013, Mr. Schutte "used a backhoe to remove a landscaping [boulder] and destroy a flower bed," and on February 3, 2016, "Mr. Schutte removed large amounts of gravel from the road through the [right-of-way] maintained by Mr. Fitzgibbon," causing damage to the road and "leaving the road difficult to pass."

### The Jury Trial

{¶5} Subsequent to additional pre-trial litigation, including a Motion *in Limine* regarding Mr. Schutte's excavation of the gravel driveway, and stipulations as to Jury Instructions, Interrogatories and Verdict Forms, a jury trial ensued. Mr. Fitzgibbon's counterclaims for intentional interference with contractual relations and criminal acts against property were tried to a jury on August 26, 2019. At trial, Mr. Fitzgibbon testified and also called the following witnesses in his case-in-chief: (1) Benjamin Skelley, sanitarian; (2) Jodi Hodson, realtor for Mr. Woo; (3) Jennifer Senskey Woo; (4) Christopher Woo; (5) Tyson Hartzler, realtor for Mr. Fitzgibbon; (6) Paul Pickett, City of Green Engineer; and (7) Detective Robert DiSabato, Summit County Sheriff's Office. Although Mr. Schutte did not testify at trial, he called the following witnesses in his case-in-chief: (1) Warren Stone, an excavator; and (2) Susan Schutte, Mr. Schutte's wife.

{¶6} Mr. Skelley testified he worked for the Summit County Public Health Department as a sanitarian for "almost seven years" and "performed the well and septic inspection" on June 2, 2015, at the Fitzgibbon residence. As a result of the septic inspection, Mr. Skelley observed "no nuisance," meaning there was no raw sewage coming out of the ground or bleeding out of the septic system. Mr. Skelley also verified he was not aware of any historical problems involving the Fitzgibbon septic system. During the septic inspection, Mr. Skelley observed the neighbor, Mr. Schutte, going "up and down" the gravel driveway, dragging a rake behind him while saying, "[b]uyer beware. Buyer beware[.]" Mr. Skelley also recalled Mr. Schutte yelling "that the septic was failing." In response, Mr. Skelley informed Mr. Schutte, "[t]hat's why we're here. That's why we're doing this and I'll find out if it is. That's the reason for the inspection."

{¶7} Ms. Hodson has been a realtor for approximately twenty-six years and she represented Mr. Woo, the buyer, in the real estate transaction with Mr. Fitzgibbon. During her testimony, Ms. Hodson reviewed Exhibit 1, the standard Ohio residential disclosure form prepared by Mr. Fitzgibbon, which disclosed the following issue with the boundary between the Fitzgibbon and Schutte properties: "January 14th-City Council passed ordinance which vacated right of way * * * between 1806 and 1794, gave easements for gravel drive. Neighbor petitioning County to restore right of way." Prior to the home and septic inspections, Mr. Woo sought more detailed information from Mr. Fitzgibbon in Addendum 1 to the real estate purchase agreement, stating: "[Mr. Fitzgibbon] to provide in writing an explanation for the boundary dispute that is listed on the property disclosure for [Mr. Woo's] review and acceptance. This is to be done before the home inspection is scheduled." Ms. Hodson explained she did not want Mr. Woo to pay for a home inspection if he was not "comfortable" with "the explanation on the boundary dispute." On May

20, 2015, the Fitzgibbons responded to Mr. Woo's request for additional information, and after receiving the response, Mr. Woo scheduled the home inspections.

{¶8} Additionally, Ms. Hodson testified she attended the septic inspection at the Fitzgibbon residence on June 2, 2015, along with Mr. Woo's fiancé, Jennifer, and Mr. Skelley. Ms. Hodson recalled the neighbor, Mr. Schutte, coming down with a "stick or something," saying, "[b]uyer beware[,] [b]uyer beware[,]" and taking photographs and or videotaping the inspection. Further, Ms. Hodson recalled Mr. Schutte saying the "septic was going to fail" and "there was something wrong with the driveway[.]" Mr. Schutte also stated, "there's an ongoing lawsuit * * * [and] [Mr. Woo] would be included in any future lawsuits" and "would be inheriting a nightmare." Mr. Schutte indicated Mr. Woo would have to "install a driveway" and Mr. Fitzgibbon, through Keller Williams, did not disclose "everything regarding the property dispute[.]" Based upon the interaction with Mr. Schutte at the septic inspection, Ms. Hodson believed Mr. Schutte and Mr. Fitzgibbon "had something going on[.] * * * Like, [] [Mr. Schutte] didn't like [Mr. Fitzgibbon] or whatever and [Mr. Schutte] was trying to kill the deal." Ultimately, Ms. Hodson testified that Mr. Woo and his fiancé "didn't want to move forward with the purchase of the [Fitzgibbon] property" and Mr. Schutte "was the catalyst for the deal falling apart."

{¶9} Ms. Woo, formerly Ms. Senskey, testified at the time of the septic inspection on June 2, 2015, she was engaged to Mr. Woo and attended the inspection as his representative. Ms. Woo agreed, at the time the real estate purchase agreement was signed, the issue regarding the property dispute was not a great concern. Ms. Woo also testified Mr. Fitzgibbon gave them "the answers" they were looking for about the property dispute prior to proceeding with the home and septic inspections. At the septic inspection, Ms. Woo remembers Mr. Schutte walking down the shared road next to the house saying, "[b]uyers beware." Mr. Schutte then told Ms. Woo they

"would probably get pulled in or dragged into some sort of lawsuit if we were to purchase the house." Ms. Woo testified she was "concerned" about this interaction and Mr. Schutte "started [their] concern about the contract which led [them] to dig in a little bit more and to find additional information about the current lawsuit[.]" Ms. Woo also testified she was concerned about "what that relationship would look like if we bought the house" as well as "being involved in any lawsuits[.]" Ms. Woo did not say, "but for Mr. Schutte's sudden appearance and behavior" they would have closed the deal. Further, Ms. Woo indicated, based upon Mr. Fitzgibbon's disclosure, she and Mr. Woo were not aware they would be involved in an ongoing lawsuit.

{¶10} Mr. Woo testified he wanted more information about the boundary dispute before scheduling the home and septic inspections, and he remembers receiving the information and "reading it." Further, Mr. Woo understood the driveway was "shared" and, as of January 2014, the City of Green was "no longer taking care of it[.]" Mr. Woo testified, "the fact that there was a lawsuit pending and the fact that the city had vacated some right-of-way," did not stop him from entering into the real estate purchase agreement for the Fitzgibbon property. However, Mr. Woo also testified he "didn't fully appreciate the extent of what was going on." When asked, "[w]hat happened to this contract," Mr. Woo testified:

> [A]fter the septic inspection [Ms. Woo] came home and told me about her interaction with the neighbor and that he was walking up [and] down the driveway with a rake saying, "[b]uyers beware."
>
> And that he also made statements that [] if we bought the house we would be involved or be brought into the lawsuits that were going on.
>
> And then at that point is when I did more research into the pending case and the previous cases and what had been going on over the years with that property.

On June 3, 2015, the day after the septic inspection, Mr. Woo officially indicated his desire to terminate the real estate purchase agreement for the Fitzgibbon property through a mutual release

of the contract. When asked "[w]hether or not, but for Mr. Schutte's interaction," Mr. Woo would have terminated the contract, Mr. Woo responded:

> [Mr. Schutte's] interaction played a large part of it. * * * [T]he fact there was [these] pending lawsuits against each other played a part in it, but the fact that it was, at least, implied or stated to us that we would be involved or get involved [] did play a large role in that.

Further, in a written explanation to Mr. Fitzgibbon regarding the termination of the contract, Mr. Woo stated:

> This is further detail regarding the encounters with the neighbor at 1795 Berna which [helped] lead to my decision to step away from purchasing 1806 Berna. During the well [and] septic inspections, the neighbor [Mr. Schutte] walked down the gravel road stating "buyer beware" over and over. He did not shout just spoke those words and said he was going to get his mail. He took the mail from 1794. He then proceeded to sit near his pond and watch as the well [and] septic inspections were being performed. He kept staring and my [r]ealtor caught him taking pictures and she told him to stop. She went over to him along with my fiancé and spoke to [Mr. Schutte]. He said that there are cameras all over the property, that we would be included in any future litigation and that the septic drains onto the neighboring property. He did say that Keller Williams and [Mr. Fitzgibbon] were not disclosing everything. He said that we would have to have a new driveway put in for access to the house. We just don't want anything to do with it. This all took place on June 2, 2015 mid-afternoon.

Mr. Woo described Mr. Schutte's behavior, specifically in waving a rake, as "not typical behavior" and said it was a "catalyst" in his decision to terminate the real estate purchase agreement.

{¶11} Mr. Hartzler, Mr. Fitzgibbon's realtor, testified he assisted with listing the Fitzgibbon residence for sale and placed a "for sale sign" in the yard. Mr. Hartzler verified an executed contract existed between the parties, and that Mr. Woo requested additional information regarding the boundary dispute prior to scheduling the home inspections. When asked why this deal did not "get done," Mr. Hartzler responded, "because [Mr. Woo] decided not to follow through with the purchase." On June 2, 2015, the same day as the septic inspection, Mr. Hartzler testified he received a telephone call from Ms. Hodson indicating Mr. Woo did not wish to follow

through with the purchase of the Fitzgibbon property and they would be sending over a mutual release. Based upon a series of communications with Ms. Hodson and Mr. Woo, Mr. Hartzler concluded Mr. Woo was not "comfortable" proceeding with the purchase of the Fitzgibbon residence because of the interaction with Mr. Schutte.

{¶12} Mr. Pickett, an engineer with the City of Green, provided the jury with an historical overview of the boundary dispute between the neighbors regarding the right-of-way known as Tim Drive, which abuts Berna Road. Mr. and Mrs. Schutte had petitioned the City to build an actual road on the right-of-way, at the City's expense, which the City entertained for some time. Ultimately, however, instead of building a road, the City vacated the right-of-way in January of 2014 and granted easements to the homeowners for its use because it did not have a public purpose of being used as a "through" street to "connect to other land development." Additionally, Mr. Pickett testified that Mr. Schutte could have built the road at his own cost, which would have caused the City to have to perpetually maintain it, but he did not do so.

{¶13} Detective DiSabato, with the Summit County Sheriff's Office, testified about an incident report dated January 9, 2013, regarding an easement on private property that was being excavated by Mr. Schutte and "moved and shifted to the east," and a large rock, owned by Mr. Fitzgibbon, that had been relocated. The City of Green Law Director made the report and listed Mr. Fitzgibbon as one of the witnesses. A criminal complaint was filed against Mr. Schutte for excavation without a permit, a misdemeanor, which was dismissed by Barberton Municipal Court. Further, Detective DiSabato testified about an incident report dated December 4, 2014, made by Mr. Fitzgibbon against Mr. Schutte, for the removal of Mr. Fitzgibbon's snow markers, but no criminal charges were filed. Overall, Detective DiSabato indicated there were thirteen incident reports involving Mr. Schutte and the ongoing dispute.

{¶14} Mr. Fitzgibbon testified he purchased his residence on Berna Road in November of 2007 and "fell in love with the house[.]" In describing his love for this property, Mr. Fitzgibbon explained:

> It's a beautiful, beautiful property. I had never lived in an area that was so open, so green, if you will[.]
>
> I grew up in the inner city of New York. A rough place for a young person to grow up.
>
> And to have an opportunity to live in a place as beautiful as the home was on Berna Road was just like the American dream. It was a beautiful house. I had everything except for the white picket fence. I had a two-story deck that butted up against a series of ponds. And I would sit out there and watch the stars and listen to the ponds and the wildlife.

In 2010, Mr. Fitzgibbon met Mr. Schutte for the first time when he came to inquire about a concrete pad Mr. Fitzgibbon installed at his property, and whether Mr. Fitzgibbon had acquired the proper permits from the City. At that meeting, Mr. Fitzgibbons recalled that Mr. Schutte said, "[y]ou're not from here[,]" and informed Mr. Fitzgibbon he was reporting him to the City regarding the concrete pad. Mr. Fitzgibbon also recalled Mr. Schutte asking him about possibly petitioning the City together about building a road.

{¶15} Mr. Fitzgibbon's interactions with Mr. Schutte increased in 2011 when Mr. Fitzgibbon saw individuals from the City surveying Tim Drive for the purpose of possibly building a road. From that time forward, Mr. Fitzgibbon was involved in a series of meetings with the City and petitions involving the right-of-way, which culminated in the City vacating the right-of-way in 2014. In describing the effect the entire "ordeal" with Mr. Schutte has had on his life, Mr. Fitzgibbon testified:

> there was a time I thought I was losing my mind. I thought I was going to lose my marriage. * * * I had absolutely everything to lose. * * * And what I didn't understand was I became a target because I disagreed with a road going in. Personally I became a target. Professionally I became a target. And it got to the

point where we had to leave. * * * I [] couldn't tell if things were going to continue to escalate and something real bad was going to happen. I couldn't raise my children in this area.

My wife specifically told me after three years of living with some of the issues and the problems and heartache and headache was, "I'm leaving. You coming with me?"

From 2012 to 2015, Mr. Fitzgibbon testified he had been "dragged into" three lawsuits, either as a witness or party, involving Mr. Schutte and the right-of-way. As to the property disclosure, Mr. Fitzgibbon stated there was "no way" for him to know if Mr. Schutte would have sued Mr. Woo, had he purchased the residence, because "[o]nly Mr. Schutte could control who he's going to sue[.]"

{¶16} In terms of the events of June 2, 2015, involving Mr. Schutte, Mr. Fitzgibbon explained June 2nd is his birthday and "we finally had our house sold and we were getting away from this problem. We were ready to move on." Then, Mr. Fitzgibbon received a telephone call from his realtor indicating, "[t]he buyers met the creepy neighbor. He freaked them out. They want out." Mr. Fitzgibbon further explained, "[w]e did everything possible to keep things away from [Mr. Schutte] finding out about when these things were being done to prevent [Mr. Schutte from meeting Mr. Woo]. Mr. Fitzgibbon indicated, "we couldn't enjoy peace of mind, quality of life in our house." Mr. Fitzgibbon also testified that, on June 2, 2015, he and his wife were in contract on another house to get a "fresh start and start over." Realizing he was now "stuck" with two mortgage notes, Mr. Fitzgibbon "went from living a pretty decent comfortable lifestyle to [a] [] tight budget." Specifically, Mr. Fitzgibbon recalled having to eat "macaroni and cheese" for 18 months, pulling his son out of private daycare and having his mother-in-law step in for childcare, borrowing fifteen thousand dollars from his father-in-law who was battling cancer at the time, and borrowing fifty thousand dollars from his own retirement. Mr. Fitzgibbon stated: "June 2nd you

[Mr. Schutte] had the opportunity to get rid of me. I would be gone. If you didn't like me this much why interfere with the contract and then [] I can't get out."

{¶17} Mr. Fitzgibbon testified he was "forced into signing" the mutual release in order to continue to try to sell his residence. According to Mr. Fitzgibbon, his realtor indicated, "[i]f you don't release [Mr. Woo] you can't continue to try to sell your house." However, because of the realtor notes regarding the house previously being "under contract" and the "neighbor dispute," the Fitzgibbons did not "get a single person through there again or foot traffic. Shut the deal down for us moving forward." Mr. Fitzgibbon described having "sleepless nights" from worry regarding his inability to sell the house, being in "limbo," and "being held hostage[,]" with two mortgage notes and his wife working part-time. Mr. Fitzgibbon indicated "my mind was just overcome," and he was eating and drinking poorly during this time period, and he "never valued the importance of a wonderful neighbor before [he] met [Mr. Schutte]." In February of 2016, Mr. Fitzgibbon rented the Berna Road residence for $1500 per month, and ultimately sold it in November of 2016 for $193,800.00.

{¶18} On cross examination, Mr. Fitzgibbon also admitted he had kidney stones in March of 2016, which his doctor directly attributed to "stress," and he engaged in confidential peer counseling offered through his place of employment and spoke with his pastor at church about the negative effect this incident had on his marriage. Mr. Fitzgibbon, however, did not produce any documentation as to his medical condition or counseling.

{¶19} After the close of Mr. Fitzgibbon's case, Mr. Schutte called two witnesses, Mr. Stone and Mrs. Schutte. Mr. Stone testified he did some work at Mr. Schutte's Berna Road property, but Mr. Schutte did not ask him to remove the large rock from Mr. Fitzgibbon's residence. Instead, Mr. Stone indicated he moved the rock due to a letter he received from a group

named "Berna Fest" who have a Berna Road festival during the summer and felt the rock caused a safety issue. Further, Mrs. Schutte, Mr. Schutte's wife of thirty-four years, testified she and her family felt intimidated by the neighbors on Berna Road and "felt like we were always being watched." Mrs. Schutte indicated that, due to the neighbors' "derogatory" comments and behavior, "it became very difficult to continue to access the property[.]"

**The Jury Award and Stipulated Damages**

{¶20} On August 29, 2019, the jury returned a verdict in favor of Mr. Fitzgibbon on his counterclaims and awarded compensatory damages in the amount of $159,313.38. Further, because the issue of punitive damages and attorney fees was bifurcated from the other issues at trial, the jury reconvened on August 30, 2019, and found Mr. Schutte acted with actual malice. Prior to deliberations on this issue, the jury was instructed as follows:

> Punitive damages may be awarded against [Mr.] Schutte as a punishment to discourage others from committing similar wrongful acts. You are not required to award punitive damages to [Mr.] Fitzgibbon, and you may not do so unless you find that [Mr.] Fitzgibbon has met his burden to prove by clear and convincing evidence that [Mr.] Schutte acted with malice.
>
> [Malice] means either:
>
> [1] a state of mind characterized by hatred, ill will, or a spirit of revenge, or
>
> [2] a conscious disregard for the rights of another person or entity that has a great probability of causing substantial harm.

Further, the jury was instructed if they found Mr. Schutte liable for punitive damages, they must also determine whether Mr. Schutte is liable for Mr. Fitzgibbon's reasonable attorney fees. The trial court would then, if necessary, determine the amount of reasonable attorney fees. The jury awarded Mr. Fitzgibbon $200,000 in punitive damages and determined Mr. Schutte is liable for reasonable attorney fees. Following the jury's award of punitive damages, the parties stipulated

to punitive damages in the amount of $20,000 and attorney fees in the amount of $35,000, plus expenses in the amount of $976.56.

{¶21} Based upon the jury verdict and the parties' stipulation as to punitive damages and attorney fees, the trial court entered a Final Judgment in favor of Mr. Fitzgibbon and against Mr. Schutte in the amount of $215,289.94.

### Post-Trial Motions

{¶22} Mr. Schutte then filed several post-trial motions, including: (1) a motion for judgment notwithstanding the verdict ("JNOV"); (2) a motion for new trial; and (3) a motion for remittitur. In his motion for JNOV, Mr. Schutte argued that Mr. Fitzgibbon did not prove two of the five elements of tortious interference with a contract. Specifically, Mr. Schutte claimed his comments at the septic inspections regarding Mr. Woo being named in a lawsuit were truthful and justified, and, due to the mutual release, there was no breach of contract. Mr. Schutte also claimed Mr. Fitzgibbon was not entitled to an award of noneconomic damages. In the alternative, Mr. Schutte sought a new trial, pursuant to Civ.R. 59(A)(2), misconduct of the jury or prevailing party, Civ.R. 59(A)(4), excessive damages given under the influence of passion or prejudice, Civ.R. 59(A)(6), the judgment is not sustained by the weight of the evidence, and Civ.R. 59(A)(7), the judgment is contrary to law. Lastly, Mr. Schutte moved for remittitur on the amount of noneconomic damages if the trial court upheld the jury's verdict and award.

{¶23} In response, Mr. Fitzgibbon argued Mr. Schutte is precluded from attacking the jury verdict based upon his stipulation to damages prior to the trial court entering judgment. Further, Mr. Fitzgibbon contended Mr. Schutte failed to demonstrate, "as a matter of fact or law," that the trial court should overturn the jury verdict and damages award.

**Trial Court Order**

**{¶24}** In denying Mr. Schutte's motions, the trial court reasoned:

* * *

Mr. Schutte makes several arguments in support of overturning the jury verdict in this matter. First, he argues that [Mr.] Fitzgibbon failed to establish the essential elements of his tortious interference with contract claim. However, the issue of whether the elements of this claim were met rested heavily upon factual issues and disputes that the jury necessarily had to consider based upon all of the evidence before it. The court simply cannot find that, based upon the evidence before the jury, the jury could only find in favor of [Mr.] Schutte. Further, the court finds that an actual breach of contract is not required if the conduct involved induced the contract to be terminated. 88 Ohio Jur.3d Torts § 17. The jury could have reasonably found based upon the history in this case[] between the parties and [Mr.] Schutte's conduct on the day of the septic inspection - that [Mr.] Schutte's conduct caused the termination of the otherwise sound contract. [Mr.] Schutte further argues that non-economic damages should not have been allowed in this case. However, pursuant to R.C. []2315.18 non-economic damages are allowable in a tort action and this case involved a tort action, not a contract action. As such, the court rejects this argument as well.

* * *

In the instant case, the jury awarded non-economic damages in the amount of $150,000.00. * * * In the instant case, there were many facts upon which the jury could have reached its number. [Mr.] Fitzgibbon testified about the strain the failed sale placed upon him, his family and his marriage. His wife gave him an ultimatum that she could no longer live next to Mr. [Schutte] due to the stress it was causing for all of them and after the sale fell through he and his family moved from the home to be away from Mr. [Schutte]. [Mr.] Fitzgibbon was then forced to maintain two homes for an extended period of time until it sold even though he worked and lived over an hour away. The court simply cannot find that the jury made its award based upon passion and prejudice.

* * *

In this case, the jury was presented with ample evidence to support its award. * * * Similarly [] the court does not agree that the judgment in this case is contrary to law.

* * *

As to the motion for remittitur, this court does not agree that the jury award was excessive in light of the contentious relationship of the parties and the protracted litigation in this case. * * *

**{¶25}** Mr. Schutte appealed, citing four assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY DENYING [MR. SCHUTTE'S] MOTIONS FOR A DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT IN VIOLATION OF CIV.R. 50(A) AND (B).**

{¶26} In his first assignment of error, Mr. Schutte argues Mr. Fitzgibbon did not prove all five elements of intentional interference with contractual relations. Specifically, Mr. Schutte argues there was: (1) no proof that Mr. Schutte was aware a binding contract existed; (2) no proof that Mr. Schutte intentionally breached a valid contract because a mutual release was signed by Mr. Fitzgibbon and Mr. Woo; and (3) Mr. Schutte's comments at the septic sewer inspection were justified. Mr. Schutte further argues his comments were mere "opinions" and he cannot be held liable for expressing his constitutionally protected subjective beliefs regarding the purchase of the Fitzgibbon residence. We disagree.

**Application of Law to the Record**

{¶27} "A party may move for directed verdict upon the 'opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence.'" *Alonso v. Thomas*, 9th Dist. Lorain No. 19CA011483, 2021-Ohio-341, ¶ 53, quoting Civ.R. 50(A)(1). A motion for directed verdict can only be granted when, having construed the evidence most strongly in favor of the nonmoving party, the trial court concludes that reasonable minds could only reach a conclusion upon the evidence submitted that is adverse to the nonmoving party. *See J. P. v. T. H.*, 9th Dist. Lorain No. 19CA011469, 2020-Ohio-320, ¶ 8. "Conversely, if there is substantial and competent evidence supporting the position of the nonmoving party and reasonable minds might reach different conclusions, a trial court must deny the motion." *Id.*, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 115 (1977). "The 'reasonable minds' test mandated by Civ.R. 50(A)(4)

requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Id.,* quoting *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3.

{¶28} "After a court enters judgment on a jury's verdict, a party may file a motion for judgment notwithstanding the verdict to have the judgment set aside on grounds other than the weight of the evidence." *Alonso* at ¶ 54, citing Civ.R. 50(B)(1). "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for directed verdict." *Alonso* at ¶ 54, quoting *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). *See also Williams v. Spitzer Auto World, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9, citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986).

{¶29} Indeed, both a motion for directed verdict and a motion for judgment notwithstanding the verdict test the legal sufficiency of the evidence, and not the credibility of the witnesses or the weight of the evidence. *Alonso* at ¶ 55. "While it is necessary to review the evidence, a motion for directed verdict and a motion for judgment notwithstanding the verdict do not present factual issues, but rather questions of law which we review de novo." *Alonso* at ¶ 55, citing *Goodyear Tire & Rubber Co.* at ¶ 4, quoting *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus.

{¶30} In the present matter, the jury returned a verdict in favor of Mr. Fitzgibbon on his counterclaim for intentional interference with contractual relations, which is also known as tortious interference with a contract. "The elements of tortious interference with [a] contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), paragraph one of the

syllabus.  Moreover, establishment of the fourth element, lack of justification, requires proof that the defendant's interference with another's contract was improper.  *Id*. at paragraph two of the syllabus.  In determining impropriety, the following factors should be considered:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id*. at paragraph three of the syllabus, citing Restatement of the Law 2d, Torts, Section 767 (1979).

{¶31}  As a preliminary issue, in his motion for JNOV, Mr. Schutte did not argue insufficient evidence regarding the first two elements of tortious interference with a contract: (1) the existence of a contract; and (2) Mr. Schutte's knowledge of the contract.  Instead, Mr. Schutte only argued insufficient evidence as to the third and fourth elements, intentional procurement of the contract's breach and lack of justification.  Notably, in his closing argument, Mr. Schutte's counsel indicated to the jury:

> I mean, we all know there's a contract here.  We know Mr. Woo signed the contract with Mr. Fitzgibbon to buy his house, that's not in dispute.

> We are not challenging that Mr. Schutte was aware of the contract.  I mean, there's a for sale sign.  I don't really know that anybody testified to it, but it was alluded to in his closing that there was a for sale sign.

> And certainly if Mr. Schutte walks by and says, "[b]uyer beware," you, know, we're not going to sit here and claim that he didn't know there was a contract.

> It's really the third and fourth elements * * * I [took] issue with[.]

As this Court has often stated, "[w]hen reviewing arguments on appeal, this Court cannot consider issues that are raised for the first time on appeal."  *Magnum Steel & Trading, L.L.C. v. Mink*, 9th Dist. Summit Nos. 26127, 26231, 2013-Ohio-2431, ¶ 23, citing *Carnegie Cos., Inc. v. Summit Properties, Inc.*, 9th Dist. Summit No. 25622, 2012-Ohio-1324, ¶ 8, quoting *Harris v. Akron*, 9th

Dist. Summit No. 24499, 2009-Ohio-3865, ¶ 9. Thus, because Mr. Schutte did not raise any arguments regarding the insufficiency of evidence as to the first two elements of tortious interference with a contract below, this Court will not address them on appeal. *Id.* at ¶ 23.

{¶32} As to the third element, whether Mr. Schutte intentionally procured the contract's breach, Mr. Schutte argues a breach, in fact, did not occur because Mr. Fitzgibbon and Mr. Woo executed a mutual release. In the parties' stipulated instructions to the jury, breach is defined as follows: "[a] contract is breached when one party fails or *refuses to perform* his duty under the contract." (Emphasis added.) The jury heard testimony from Ms. Hodson, Mr. Woo, Mr. Hartzler, and Mr. Fitzgibbon that, after the encounter with Mr. Schutte at the septic inspection, Mr. Woo expressed his desire to terminate the contract to purchase the Fitzgibbon residence. Specifically, Ms. Hodson, Mr. Woo's realtor, contacted Mr. Hartzler, Mr. Fitzgibbon's realtor, the same day as the septic inspection, to let him know that Mr. Woo did not wish to close on this deal and would be sending Mr. Fitzgibbon a mutual release. Mr. Fitzgibbon testified he was "forced" into signing the mutual release in order to keep showing the residence to other potential buyers. Certainly, even though Mr. Fitzgibbon agreed to release Mr. Woo from any liability in order to continue showing the property, the jury heard ample testimony that Mr. Woo refused to continue performing on the contract. Additionally, the jury heard testimony that Mr. Schutte was the "catalyst," for the termination of the real estate purchase agreement and his actions played a "large part" in Mr. Woo's decision to terminate the contract. The jury also heard Mr. Fitzgibbon testify that, after the septic inspection, his realtor called him that same day and said: "[t]he buyers met the creepy neighbor. He freaked them out. They want out." Mr. Woo also testified "the fact that there was a lawsuit pending and the fact that the city had vacated some right-of-way," did not stop him from entering into the real estate purchase agreement for the Fitzgibbon property.

{¶33} Further, as to the fourth element, justification, the jury heard testimony regarding the detailed response Mr. Fitzgibbon provided Mr. Woo regarding the boundary dispute. During deliberations, the jury also was able to review the actual May 20, 2015 Addendum, which stated:

1. The [Schuttes] made multiple requests to the City of Green to construct a dedicated road over the Unnamed, Unimproved Right-of-Way, known as Tim Drive. The City of Green denied funding for these requests. The [Fitzgibbons] along with the owners of 1800 opposed the construction of a road and instead, favored the vacation of Tim Drive.

2. Green City Ordinance No. 2013-22, passed January 14, 2014, Vacating the Unnamed, Unimproved Right-of-Way Alleyway, known as Tim Drive which [a]buts Berna Road. This Ordinance was sponsored by the City of Green Council President, supported by the City of Green Mayor and unanimously passed by the City of Green Council. The [Schuttes] were in opposition to this Ordinance.

3. The City of Green prepared a Plat Map Vacating the Unnamed, Unimproved Right-of-Way, known as Tim Drive, per Ordinance No. 2013-22, for Summit County Records. The Ordinance outlined the permanent easements for 1794, 1800 and 1806 for use of the gravel drive to access their properties.

4. Property owners of 1794 named Robert, Susan and Sarah Schutte, filed a Complaint in Summit County Common Pleas Court, Case No. CV 2015-04-2129, dated March 31, 2015, against the City of Green and several persons, including the [Fitzgibbons], which disputes the City's Ordinance and Vacation Plat, among other things, and includes a Petition demanding that the Court establish a right-of-way on the property known as Tim Drive (Prior actions were filed and dismissed as Summit County Case No. CV 2012-05-3149 and CV 2014-07-3377).

5. [The Schutte Property at] 1794 [Berna Road] has been an [uninhabited] property since 1806 was purchased by the [Fitzgibbons] in November of 2007.

The jury heard testimony that, after receiving the above response from Mr. Fitzgibbon, Mr. Woo moved forward under the contract and scheduled the home inspections. However, after the encounter with Mr. Schutte, Mr. Woo immediately terminated the contract by sending a mutual release the next day. According to the testimony of Ms. Hobson, Mr. Schutte told Ms. Woo that if they purchased the Fitzgibbon property they "would be included in any future lawsuits[,]" and "would be inheriting a nightmare." Indeed, as Mr. Fitzgibbon testified, only Mr. Schutte controls

who he will, or will not, sue in relation to the boundary dispute. As such, Mr. Schutte's comment that Mr. Woo will be sued can be construed as more of a threat, than a good citizen's warning to another person or the expression of an opinion. Moreover, the Addendum, provided by Mr. Fitzgibbon, contains very detailed information about the boundary dispute, including case numbers and the fact that Mr. Schutte sued individual neighbors, which painted a very clear picture of the ongoing, contentious situation for Mr. Woo and the jury. The jury also heard detailed testimony regarding the personal animosity between Mr. Schutte and Mr. Fitzgibbon, the damage to Mr. Fitzgibbon's health, marriage, and finances from Mr. Schutte's interference, and that Mr. Schutte's comments about the septic failing and needing to put in a new driveway were untruthful. Nevertheless, the record indicates that Mr. Schutte's comments, even though untruthful, ultimately sound in fact, not protected opinion. *See Fred Siegel Co.* at paragraph three of the syllabus.

{¶34} Based upon the foregoing, and in construing the evidence most strongly in favor of Mr. Fitzgibbon, the trial court did not err in denying Mr. Schutte's motion for JNOV and concluding that, upon the submitted evidence, reasonable minds could not only reach a conclusion that is *adverse* to Mr. Fitzgibbon on the elements of procuring a breach and justification. Therefore, Mr. Schutte's arguments are not well-taken.

{¶35} Mr. Schutte's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

**THE TRIAL JUDGE ABUSED HER DISCRETION, TO [MR. SCHUTTE'S] CONSIDERABLE DETRIMENT, BY FAILING TO ORDER A NEW TRIAL AS WARRANTED UNDER CIV.R. 59(A).**

{¶36} In his second assignment of error, Mr. Schutte argues the trial court erred in denying his motion for new trial because: (1) "[g]rounds for jury misconduct exist under Civ.R.59(A)(2) when a jury awards an amount for damages which is unsupported by the evidence," and (2)

"grounds for a new trial are warranted under Civ.R. 59(A)(4) where there is an excessive or inadequate award that appears to have been given under the influence of passion or prejudice[.]" We, however, are not persuaded by Mr. Schutte's arguments.

**Application of Law to the Record**

{¶37} Pursuant to Civ.R. 59(A), "[a] new trial may be granted to all or any of the parties and on all or part of the issues" upon a finding of one of the nine grounds. Mr. Schutte specifically sought a new trial under the following subsections of Civ.R. 59(A):

(2) Misconduct of the jury or prevailing party; [and]

(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice[.]

"Depending upon the basis of a motion for a new trial, this Court reviews the trial court's decision to grant or deny the motion under either a de novo or an abuse of discretion standard of review." *Designers Choice, Inc. v. Attractive Floorings, LLC*, 9th Dist. Lorain No. 19CA011576, 2020-Ohio-4617, ¶ 10, quoting *Calame v. Treece*, 9th Dist. Wayne No. 07CA0073, 2008-Ohio-4997, ¶ 13, citing *Rohde v. Farmer*, 23 Ohio St.2d 82 (1970), paragraphs one and two of the syllabus. "[If] the basis of the motion involves a question of law, the de novo standard of review applies, and when the basis of the motion involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies." *Dragway 42, L.L.C. v. Kokosing Constr. Co., Inc.*, 9th Dist. Wayne No. 09CA0073, 2010-Ohio-4657, ¶ 32.

{¶38} Additionally, "[w]here there has been irregularity or misconduct on the part of the jury, which might affect its judgment, or improperly influence the verdict, a new trial should be granted. Where, however, it clearly appears that no improper effect could arise from the alleged misconduct, the verdict should stand." *McDonald v. Akron*, 86 Ohio App.3d 209, 210 (9th

Dist.1993). The quintessential question, then, is whether the jury's misconduct could have an "improper effect on the verdict." *Id.*

**{¶39}** As this Court aptly explained in *Pena v. Northeast Ohio Emergency Affiliates, Inc.*, 108 Ohio App.3d 96, 104 (9th Dist.1995):

> [a]n appellate court reviewing whether a trial court abused its discretion in ruling on a motion for a new trial pursuant to Civ.R. 59(A)(4) must consider (1) the amount of the verdict, and (2) whether the jury considered improper evidence, improper argument by counsel, or other inappropriate conduct which had an influence on the jury. To support a finding of passion or prejudice, it must be demonstrated that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities. The mere size of the verdict is insufficient to establish proof of passion or prejudice.

(Internal citation omitted.)

**{¶40}** Here, the jury heard testimony regarding Mr. Fitzgibbon's health relating to stress and kidney stones, dietary issues, sleepless nights, monetary concerns with two mortgages, a marital ultimatum and counseling, and that Mr. Fitzgibbon's "mind was consumed" due to Mr. Schutte's interference with the real estate purchase agreement. Further, the *stipulated* jury instructions stated, as to noneconomic loss, that: "[n]oneconomic loss means harm other than economic loss that results from [Mr.] Fitzgibbon's loss, including, but not limited to, emotional distress or actual harm to reputation, and any other intangible loss, if they are reasonably to be expected to result from the interference." The jury was also instructed as follows:

> Circumstances in the case may arouse sympathy for one party or the other. Sympathy is a common human emotion. The law does not expect you to be free of such normal reactions. However, the law and your oath as jurors require you to disregard sympathy and not to permit it to influence your verdict.

> You must not be influenced by any consideration of sympathy or prejudice. It is your duty to weigh the evidence, to decide the disputed question of fact, to apply the instructions of law to your findings, and to render your verdict accordingly. Your duty as jurors is to arrive at a fair and just verdict.

During his closing argument, Mr. Fitzgibbon's counsel also warned the jury, in their calculation of noneconomic damages, against being "inflamed by passion and prejudice against Mr. Schutte," and coming back with a "manifestly excessive" award.

{¶41} Based upon the record before us, there is no evidence of irregularity or misconduct on the part of the jury, or that the jury disregarded the trial court's instructions in any way. Further, as to Mr. Schutte's argument that the jury acted with passion or prejudice in awarding noneconomic damages to Mr. Fitzgibbon, Mr. Schutte has failed to demonstrate that the "jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities." Thus, this Court cannot say the trial court erred in denying Mr. Schutte's motion for new trial.

{¶42} Mr. Schutte's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

**A FURTHER ABUSE OF DISCRETION WAS COMMITTED WHEN THE TRIAL JUDGE REFUSED TO ORDER A REMITTITUR OF THE CLEARLY EXCESSIVE VERDICT AS WARRANTED UNDER THE CIRCUMSTANCES[.]**

{¶43} In his third assignment or error, Mr. Schutte argues $150,000.00 in noneconomic damages is "inappropriate" when the jury only awarded Mr. Fitzgibbon $9,147.20 for his "actual pecuniary, or economic damages." Mr. Schutte, for argument's sake, further contends one-half of the economic damages, or $4,573.60, should be offered to Mr. Fitzgibbon for noneconomic damages. For the reasons that follow, Mr. Schutte's argument is not well-taken.

{¶44} "[R]emittitur is merely an alternative to a new trial[.]" *Brooks v. Wilson*, 98 Ohio App.3d 301, 307 (9th Dist.1994). Where a party has been awarded "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice" it is within a trial court's discretion to grant a new trial. Civ.R. 59(A)(4). If the trial court is faced with a verdict

that is manifestly excessive but does not appear to be influenced by passion or prejudice, the court may order a remittitur. *Lance v. Leohr*, 9 Ohio App.3d 297, 298 (9th Dist.1983). This Court reviews a trial court's decision to deny remittitur for an abuse of discretion. *Tesar Industrial Contractors, Inc. v. Republic Steel*, 9th Dist. Lorain Nos. 16CA010957, 16CA010960, 2018-Ohio-2089, ¶ 31, citing *Jemson v. Falls Village Retirement Community, Ltd.,* 9th Dist. Summit No. 20845, 2002-Ohio-4155, ¶ 26.

{¶45} Moreover, "the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." (Emphasis sic.) *Price v. KNL Custom Homes, Inc.*, 9th Dist. Summit No. 26968, 2015-Ohio-436, ¶ 46, quoting *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 654 (1994). *See also Tesar Indus. Contractors, Inc.* at ¶ 33.

{¶46} Here, the jury heard Mr. Fitzgibbon testify, at length, regarding the level of emotional distress he suffered at the hand of Mr. Schutte regarding the terminated real estate purchase agreement. Mr. Fitzgibbon admitted "his mind was consumed," he had health and sleep issues, had two mortgages, and would potentially lose his marriage if he did not leave his Berna Road residence. On cross-examination, Mr. Fitzgibbon stated he sought counseling through a peer group at work and through his pastor at church. Mr. Fitzgibbon also described having to borrow money from his sick father-in-law and his own retirement in order to keep afloat. The jury was instructed by the trial court, with no objection from Mr. Schutte, about the proper calculation of economic and noneconomic damages. As such, based upon this record, we cannot say the trial court abused its discretion in denying Mr. Schutte's motion for remittitur because the jury's award of noneconomic damages was not manifestly excessive in light of the testimony and evidence.

**ASSIGNMENT OF ERROR IV**

**THE JURY'S VERDICT AGAINST [MR. SCHUTTE] IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE[.]**

**{¶47}** In his fourth assignment of error, Mr. Schutte argues the jury's verdict and award is against the manifest weight of the evidence because: (1) no evidence was presented that Mr. Schutte lacked justification for advising Mr. Woo he would be brought into the lawsuit; (2) there was no breach of contract due to the mutual release; and (3) $150,000.00 in noneconomic damages is not supported by the weight of the evidence, "even if no passion or prejudice is shown." We disagree.

**{¶48}** When reviewing the manifest weight of the evidence in a civil case, this Court:

> weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

*Coeurvie v. McGonigal*, 9th Dist. Summit No. 27981, 2017-Ohio-2634, ¶ 15, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115 (9th Dist.2001). "Manifest weight challenges the burden of persuasion." *Stocker v. Stocker*, 9th Dist. Wayne No. 12CA0021, 2012-Ohio-5821, ¶ 26. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

**{¶49}** Here, as thoroughly discussed above, the jury heard testimony and viewed the May 20, 2015 Addendum to the real estate purchase agreement wherein Mr. Fitzgibbon provided Mr. Woo with detailed information regarding the boundary dispute and the lawsuits filed by Mr. Schutte against the City and individual neighbors on Berna Road. Although Mr. Woo testified he did not "appreciate" the "extent" of the issues with the property until speaking with the City Law

Director, the jury also heard Mr. Woo testify, "the fact that there was a lawsuit pending and the fact that the [C]ity had vacated some right-of-way," did not stop him from entering into the real estate purchase agreement. Further, because Mr. Schutte has exclusive control over which individuals he may sue, Mr. Fitzgibbon could not say Mr. Schutte would absolutely bring Mr. Woo into the pending lawsuit. Instead, Mr. Schutte advised Mr. Woo if he bought the Fitzgibbon property, he *would* be sued. The only logical reason for making such a threat was to poison the deal between Mr. Fitzgibbon and Mr. Woo, especially in light of the fact Mr. Woo had nothing to do with Mr. Schutte's claims against the City, Mr. Fitzgibbon, and Mr. Strittmatter.

{¶50} Further, as to the issue of breach, Mr. Schutte agreed to the language in the jury instructions defining "breach" as "when one party fails or refuses to perform his duty under the contract." The jury heard testimony that, on the same day as the septic inspection and Mr. Schutte's interference, Mr. Woo decided to terminate the contract and advised Mr. Fitzgibbon's realtor that he would be sending over a mutual release. Mr. Woo stated Mr. Schutte was the "catalyst" in his decision to terminate the contract, and, through a series of communications between the realtors, explained in detail why he wanted "nothing to do" with the Fitzgibbon property. As such, based upon this testimony, the jury could reasonably believe Mr. Woo refused to perform his duty to close on the Fitzgibbon property based upon Mr. Schutte's behavior and comments at the septic inspection.

{¶51} Finally, as to the issue of noneconomic damages, the jury obviously found Mr. Fitzgibbon's testimony credible regarding the emotional distress he suffered due to the termination of the real estate purchase agreement with Mr. Woo by way of Mr. Schutte's interference. Importantly, Mr. Schutte agreed, after hearing all of the testimony in this matter, to instruct the jury about the difference between economic and noneconomic damages, and the proper way to

calculate each type of damage. Common sense then dictates the jury could not have clearly lost its way in considering Mr. Fitzgibbon's emotional distress in awarding noneconomic damages in the amount of $150,000.00, which are well within statutory limits.

{¶52} Based upon this record, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

{¶53} Mr. Schutte's fourth assignment of error is overruled.

### III.

{¶54} For the reasons stated above, Mr. Schutte's four assignments of error are overruled. The Judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____

BETTY SUTTON
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

PAUL W. FLOWERS and LOUIS E. GRUBE, Attorneys at Law, for Appellant.

BRYAN P. O'MALLEY and DEAN M. VALORE, Attorneys at Law, for Appellee.